[L. A. Nos. 23683, 22553, 23135, 23180, 23685, 23717. In Bank.
Oct. 30, 1957.]

ANNELEN SPELLENS, Plaintiff and Appellant, v. SOL
CARL SPELLENS, Defendant and Appellant, and five
connected appeals.

[L. A. No. 23684. In Bank. Oct. 30, 1957.]

SOL CARL SPELLENS, Appellant, v. ANNELEN
SPELLENS, Respondent.

Leonard Horwin and Richard I. M. Kelton for Appellant Annelen Spellens.

Reynolds, Painter & Cherniss, Pacht, Tannenbaum & Ross, Pacht, Ross, Warne & Bernhard, Isaac Pacht, Clore Warne, Stuart L. Kadison, Harvey M. Grossman and Ellis J. Horvitz for Appellant Sol Carl Spellens.

CARTER, J.—Plaintiff, married to Robert Seymon, had marital difficulties because of Robert's conduct; there were two children of the marriage. While this condition existed

and she was considering divorce, defendant, Sol Spellens, told her he was in love with her and wanted to marry her. He was an old family friend of substantial wealth with extensive business experience and represented that he had had wide legal experience. He said he was aware of plaintiff's marital problems and that she was entitled to a divorce. He promised that when she divorced Robert he would marry her, take care of her and her children and make her a partner in all of his property. She still tried to save her marriage with Robert but was unsuccessful. In January, 1951, she decided to divorce Robert and defendant arranged for an attorney to represent her and provided funds therefor. She commenced an action for divorce the next month, based on extreme cruelty. After the commencement of the action, defendant conferred with Robert about a property settlement and advised plaintiff to waive her rights to any community property and all but a nominal $1.00 per month alimony. This she did, and defendant again made the same promises he had made before. Plaintiff obtained an interlocutory divorce decree on March 13, 1951, and defendant represented that upon the granting of the interlocutory decree he and plaintiff could be legally married in Mexico and the marriage would be valid anywhere. He took her to Mexico where he obtained an attorney who gave the same advice. Four days after the interlocutory decree, plaintiff and defendant returned to Mexico and saw the same attorney who was shown the decree and confirmed his former advice. As a result of this advice plaintiff and defendant were married in Mexico by the attorney, and they began living together as husband and wife with plaintiff's children as part of the family. Plaintiff became pregnant by defendant in 1951 and had a miscarriage. During the time they lived together defendant was extremely cruel to plaintiff, and in March, 1952, defendant suggested they separate, to which plaintiff objected, but defendant said he had been advised they were not legally married. Plaintiff consulted an attorney and was advised that the validity of her marriage lay in the field of unsettled law, but he thought defendant would be estopped to assert its invalidity. Plaintiff thereupon commenced her action (hereinafter called main action) on March 24, 1952. The parties separated for a brief period but then lived together until defendant left her in September, 1952.

In an amended complaint plaintiff asked that her marriage be declared valid, that defendant be estopped to question its

validity, and for separate maintenance, or, in the alternative, if the marriage was found invalid, damages because of defendant's fraudulent representations and promises and an award of the "community property" (that property accumulated while they were purportedly married). Plaintiff filed amendments and supplements to her complaint, adding other causes of action, and after an adverse determination by the court as to some of them, a second amended complaint for damages for fraud was filed. She sought a division of the community property and to be appointed guardian ad litem for her children and an allowance for their support on the theory of putative spouse. Defendant made general denials and asserted as an affirmative defense that the marriage was void as being after the entry of an interlocutory decree but before the entry of a final decree of divorce and asked that it be declared invalid.

The case was finally tried after various motions for support and attorney's fees hereinafter mentioned. The court in its findings recited that defendant raised the issue of the validity of the marriage and by stipulation plaintiff was to make an offer of proof thereon and on the pleadings and the offer the court should decide that issue and determine whether defendant was estopped to deny its validity, as though such issues had arisen through an objection by defendant to the introduction of any evidence by plaintiff; all facts pleaded and set forth in the offer of proof were to be taken as true on those issues, hence the question presented was one of law. Also involved was the question of whether plaintiff could recover on the agreement of defendant that he would validly marry plaintiff, share his property with her and care for plaintiff and her children if she married him. The court sustained the objection to the introduction of any evidence on those issues; the court then found the facts true on those issues; in its conclusion of law it determined that the marriage was invalid and no estoppel could exist. It also determined that the "agreement" was invalid as promotive of divorce. It granted plaintiff permission to file her second amended complaint. The trial proceeded, and the court granted a nonsuit as to the first and third causes of action in the second amended complaint which was for damages for defendant's fraudulent representations and plaintiff's reliance thereon to her injury and also for the reliance by herself and children on the misrepresentations of defendant as to their support and maintenance, holding as a matter of law that there could be no

recovery for such fraud. The court then found that plaintiff and defendant were well acquainted since 1947 and went through a marriage ceremony in Mexico and from March 17, 1951, to September 22, 1952, they resided together as husband and wife and plaintiff in good faith believed the marriage valid; that plaintiff would testify that her marriage with Robert had failed; that plaintiff was of limited business and no legal experience but defendant claimed much legal experience; that plaintiff trusted and had great confidence in defendant which was fostered by him; that defendant made the representations to plaintiff heretofore referred to in the statement of facts and intended that plaintiff rely thereon and plaintiff relied thereon, marrying defendant, living with him as a wife and having her children reside with them; that defendant represented to friends, relatives and others that they were married; that after the commencement of the action herein the same conditions continued to exist except that defendant represented to the court that the marriage was invalid; that during all of said time defendant knew the marriage was invalid and intended it that way which facts were known exclusively by him; that plaintiff and defendant were not legally married because of the lack of a final decree of divorce; that defendant treated plaintiff with extreme cruelty to her physical and mental prejudice; that during the time plaintiff rendered valuable services to defendant in the belief that she was his wife, and during said time defendant earned $58,574 out of a total income of $79,244; that "by analogy to the community property laws of the State . . . the residue of the sums earned by . . . defendant . . . as the result of his own efforts during the period commencing March 17, 1951, and ending September 22, 1952, after deducting money spent by way of quasi-community expense, is . . . $10,052.00 . . . that included in said quasi-community expense and, therefore, deducted by the Court in arriving at the balance of quasi-community income on hand, is . . . $7,200.00 . . . which was expended by the defendant . . . during said period in the support of plaintiff's aforesaid minor children. . . ."

Accordingly judgment was entered determining the marriage to be invalid; that no estoppel existed and no damages were recoverable[1] for defendant's fraud; that plaintiff was the putative wife of defendant from March 17, 1951, to Sep-

---

[1]Pursuant to Civil Code, section 43.5(d):
"No cause of action arises for: . . .
"(d) Breach of promise of marriage."

tember 22, 1952; that by reason of the latter fact and defendant's cruelty, plaintiff was entitled to all the "community" property (that earned during the mentioned period), plus $10,052, the balance of the "quasi-community property after deduction of quasi-community expense"; that plaintiff may not recover her attorney's fees incurred in the action; that plaintiff should not recover on the other issues disposed of on stipulation and objection to her evidence. Both plaintiff and defendant appeal from the portions of the judgment unfavorable to each of them.

After commencing her action plaintiff had an order to show cause issued why she should not be allowed counsel fees, costs and support money pendente lite. The court denied any allowance on the ground that there was no valid marriage. She appeals from that order of denial. She also asked for the same allowances pending her appeal from that order and was allowed attorney's fees on appeal but no support. She appeals from the portion of that order denying her an allowance for support. Defendant's motion to set aside the order fixing counsel fees was denied and he appeals from that order.

Plaintiff contends that the defendant was estopped to deny the validity of the Mexican marriage or, stated another way, that he was estopped to deny that the California interlocutory decree of divorce from Robert terminated that marriage and made the Mexican marriage valid as far as he was concerned; that thus the parties, as far as defendant and this litigation is concerned, must be treated as husband and wife. Defendant contends that the strong policy of this state forbids the establishing of an estoppel;[2] that no marriage contrary to statute may be created by estoppel.

The rule on estoppel is stated in *Watson* v. *Watson,* 39 Cal.2d 305, 307 [246 P.2d 19] : "To maintain his action it is necessary for the plaintiff to deny the validity of the Nevada divorce decree which he secured from his first wife. . . . In *Rediker* v. *Rediker,* 35 Cal.2d 796, 805 [221 P.2d 1, 20 A.L.R. 2d 1152], the court stated that '*the validity of a*

---

[2] "A subsequent marriage contracted by any person during the life of a former husband or wife of such person, with any person other than such former husband or wife, is illegal and void from the beginning, unless:

"1. The former marriage has been annulled or dissolved. In no case can a marriage of either of the parties during the life of the other, be valid in this state, if contracted within one year after the entry of an interlocutory decree in a proceeding for divorce." (Civ. Code, § 61, subd. 1.)

*divorce decree cannot be contested by a party who has procured the decree or a party who has remarried in reliance thereon or by one who has aided another to procure the decree so that the latter will be free to marry.'* The decisions in this state and in other states are ample authority for the statement in the Rediker case.

"The fact that in the present case it had been determined in a prior action that no marriage existed at the time of the alleged tort does not benefit the plaintiff's position. Such an eventuality was taken into consideration in *Harlan v. Harlan,* 70 Cal.App.2d 657 [161 P.2d 490]. Before their marriage the plaintiff husband in that case had been instrumental in securing a Mexican divorce for the defendant from her first husband. Thereafter the plaintiff sought an annulment of their marriage as bigamous, asserting that the Mexican divorce was invalid for want of jurisdiction of the court. That situation is analogous to the present case in that in bringing his action it is necessary for the plaintiff to assert the invalidity of a previous divorce obtained by him. In the Harlan case the trial court found that the Mexican divorce decree was invalid, as was the Nevada divorce in the present case, and granted the annulment. In reversing the judgment the court held that notwithstanding the fact that the Mexican decree was invalid, the plaintiff was estopped from asserting its invalidity because he had aided and counseled the defendant in procuring it. In the present case the plaintiff is likewise estopped from asserting the invalidity of the Nevada divorce obtained through his own machination. The fact that he obtained that divorce as the party participant states a stronger case against him than operated as an estoppel in the Harlan case.

"In a decision by the New York Court of Appeals, relied upon in the Rediker case, a defendant in a suit for separate maintenance asserted as a defense that the marriage was bigamous on the ground that a prior divorce he had obtained from a Nevada court was invalid for want of jurisdiction of that court. The New York court expressly assumed the invalidity of the divorce action but refused to let it be asserted, stating that 'to refuse to permit this defendant to escape his obligation to support plaintiff *does not mean that the courts of this State recognize as valid a judgment of divorce which necessarily is assumed to be invalid in the case at bar, but only that it is not open to defendant in these proceedings to avoid the responsibility which he voluntarily incurred.'* (*Krause* v.

*Krause,* 282 N.Y. 355, 359-360 [26 N.E.2d 290].)'' (Emphasis added.) ▆ It is said in *Dietrich* v. *Dietrich,* 41 Cal.2d 497, 505 [261 P.2d 269] : ''On this record it is immediately obvious that the very evidence offered to show the *invalidity of the ceremonial marriage* was properly excluded because that same evidence shows that *Noah is estopped* to assert the claimed invalidity of the Nevada divorce [obtained by Carol from another man]. With full knowledge of the circumstances under which that divorce was obtained, and in reliance on such divorce, Noah went through a marriage ceremony and lived with Carol as her husband for many years. The *public policy* of this state, in the circumstances of this case, as in those considered in *Rediker* v. *Rediker* (1950), 35 Cal.2d 796, 808 [221 P.2d 1, 21 A.L.R.2d 1152], requires recognition of the second marriage rather than the 'dubious attempt to resurrect the original' marriage.'' (Emphasis added.) (See also *Rediker* v. *Rediker,* 35 Cal.2d 796 [221 P.2d 1, 21 A.L.R. 2d 1152] ; *Bruguiere* v. *Bruguiere,* 172 Cal. 199 [155 P. 988, Ann. Cas. 1917, 122] ; *Kelsey* v. *Miller,* 203 Cal. 61 [263 P. 200] ; *Harlan* v. *Harlan,* 70 Cal.App.2d 657 [161 P.2d 490] ; *Estate of Davis,* 38 Cal.App.2d 579 [101 P.2d 761, 102 P.2d 545] ; *Hensgen* v. *Silberman,* 87 Cal.App.2d 668 [197 P.2d 356] ; *In re Kyle,* 77 Cal.App.2d 634 [176 P.2d 96] ; *Adoption of D. S.,* 107 Cal.App.2d 211 [236 P.2d 821] ; *Estate of Coleman,* 132 Cal.App.2d 137 [281 P.2d 567] ; *Union Bank & Trust Co.* v. *Gordon,* 116 Cal.App.2d 681 [254 P.2d 644] ; *Morrow* v. *Morrow,* 40 Cal.App.2d 474 [105 P.2d 129] ; 175 A.L.R. 538 ; 153 *id.* 941 ; 140 *id.* 914 ; 122 A.L.R. 1324 ; 109 *id.* 1018 ; Rest., Conflicts, § 112.) *Roberts* v. *Roberts,* 81 Cal.App. 2d 871 [185 P.2d 381], insofar as it is to the contrary must be deemed as disapproved. The theory is that the marriage is not made valid by reason of the estoppel but that the estopped person may not take a position that the divorce or latter marriage was invalid. (*Watson* v. *Watson, supra,* 39 Cal.2d 305 ; *Rediker* v. *Rediker, supra,* 35 Cal.2d 796.) And as to the public policy it is said : '' 'To hold otherwise protects neither the welfare nor morals of society but, on the contrary, such holding is a flagrant invitation to others to attempt to circumvent the law, cohabit in unlawful state, and when tired of such situation, apply to the courts for a release from the indicia of the marriage status.' (*Harlan* v. *Harlan,* 70 Cal.App.2d 657, 663-664 [161 P.2d 490].) . . .

''Defendant contends, however, that the public policy of

the state requires the annulment of bigamous marriages whenever their bigamous character is discovered. We find no basis for such a sweeping application of public policy. . . . Defendant does not indicate how any public purpose is served by the annulment of his marriage. . . .

" 'It can no longer be said that public policy requires nonrecognition of all irregular foreign divorces. We have recognized that the interest of the state in many situations may lie with recognition of such divorces and preservation of remarriages rather than a dubious attempt to resurrect the original. From a pragmatic viewpoint, judicial invalidation of irregular foreign divorces and attendant remarriages, years after both events, is a less than effective sanction against an institution whose charm lies in its immediate respectability. We think it may now be stated that the *general* public policy in this jurisdiction, as judicially interpreted, no longer prevents application in annulment actions of the laches and estoppel doctrines in determining the effect to be given such divorce decrees.' (Vinson J., in *Goodloe* v. *Hawk*, 113 F.2d 753, 757; *Harlan* v. *Harlan*, 70 Cal.App.2d 657, 663-664 [161 P.2d 490]; *Krause* v. *Krause*, 282 N.Y. 355, 360 [26 N.E.2d 290].) We conclude that the public policy of this state requires the preservation of the second marriage and the protection of the rights of the second spouse 'rather than a dubious attempt to resurrect the original' marriage.'' (*Rediker* v. *Rediker*, supra, 35 Cal.2d 796, 806.)

The foregoing authorities involved an estoppel to deny the validity of a decree invalid because of lack of jurisdiction of the court which purported to grant it but we think the same policy requires the same result in the instant case where there was a marriage before a year after the entry of an interlocutory decree. The policy applies equally in one case as the other. The policy against a bigamous marriage expressed in the first sentence of section 61 of the Civil Code, *supra*, involved in the cited cases, is no stronger nor more compelling than that involved here which is that there may not be a valid marriage if contracted within less than a year after the entry of an interlocutory decree of divorce. (Civ. Code, § 61, subd. 1, *supra*.) We fail to see any difference in this case and one where defendant had participated in the obtaining of an invalid Nevada or Mexican divorce rather than a California interlocutory decree. It is not the marriage which is found valid as indicated by the above authorities and thus the policy of section 61, subdivision 1, is not thwarted.

Rather it is that defendant by reason of his conduct will not be permitted to question its validity or the divorce; so far as he is concerned, he and plaintiff are husband and wife. The interlocutory decree declared that the parties were entitled to a divorce and it was not unreasonable for plaintiff to have been led to believe that a marriage in Mexico would be valid. The circumstances here clearly show fraud and estoppel as far as the defendant is concerned; it would be difficult to imagine a stronger case in this field of law.

The statement in *Rediker* v. *Rediker, supra,* 35 Cal.2d 796, 808, that the doctrine of estoppel "presupposes the entry of final decree" and for that reason certain cases are distinguishable, does not lay down a rule contrary to the foregoing conclusion; moreover if it seems to do so none is indicated in the other and later authorities heretofore cited. Such cases as *Sullivan* v. *Sullivan,* 219 Cal. 734 [28 P.2d 914], *Estate of Elliott,* 165 Cal. 339 [132 P. 439], *Dominguez* v. *Dominguez,* 136 Cal.App.2d 17 [288 P.2d 195], and *Parmann* v. *Parmann,* 56 Cal.App.2d 67 [132 P.2d 851], do not discuss the theory of estoppel and its essential policy and results as announced in the above discussed authorities; insofar as they may be contrary to the instant case they are overruled. The same might be said of *Anderson* v. *Anderson,* 7 Cal.2d 265 [60 P.2d 290], and *Brandt* v. *Brandt,* 32 Cal.App.2d 99 [89 P.2d 171], but in those cases there were no divorce proceedings to terminate the first proceeding and hence they are distinguishable. The out-of-state cases are not persuasive. An interlocutory decree of divorce at least gives color as a judicial determination of divorce especially when we consider that the final decree ordinarily follows at the end of a year as a matter of course.[3]

---

[3] "Unlike other preliminary or interlocutory orders, the statutory interlocutory decree in a divorce suit is final, except as against such attack as is authorized by statute for the modification or vacating of final judgments. Such a decree, unless vacated on motion for new trial, on motion under § 473 of the Code of Civil Procedure, or on appeal, is a final adjudication of all matters therein decided, the final dissolution of the marriage being the only question held in abeyance pending entry of the final decree. If the interlocutory decree is regularly made and correctly entered, it cannot be vacated on the bare application of the plaintiff without notice to or consent of the defendant, even though the defendant defaulted. Indeed, it is expressly provided that after entry of the interlocutory judgment, neither party has the right to dismiss the action without the other's consent.

"After the time to appeal or to move to vacate the decree has expired, the trial court is wholly without jurisdiction to alter or set aside the interlocutory judgment. While it has the inherent power to refuse to enter a final decree dissolving the marriage, where it is made to appear

It may be noted also that we are not recognizing a common-law marriage which does not exist in this state for the theory is that the marriage is not validated; it is merely that defendant cannot contest it. Thus the judgment must be reversed.

■ It follows from the estoppel that plaintiff was entitled to attorney's fees, costs and support during trial and on appeal (see *Dietrich* v. *Dietrich, supra,* 41 Cal.2d 497) as defendant is estopped to deny the validity of the marriage and the orders with respect thereto must be reversed. These matters will have to be determined by proceedings in the lower court.

■ Plaintiff's action for damages for fraud in inducing the marriage (see, *Langley* v. *Schumacker,* 46 Cal.2d 601 [297 P.2d 977]) should not stand as she, by the estoppel, is receiving everything flowing from a valid marriage and we apply the same law as if they were validly married; this is conceded by plaintiff as she states in her brief: "On this appeal, the issue of whether California abolished the right of a woman who is fraudulently induced into a void marriage to sue for her injury is only reached if this Appellate Court holds that no valid marriage exists between the parties. If the Appellate Court agrees with Annelen that the parties are legally married, this question is moot." That includes the situation where estoppel may exist as we have indicated it does. The same comments are true with regard to plaintiff's claims of property rights by reason of a putative marriage and compensation for wifely services rendered; defendant is estopped to deny the existence of a valid marriage and hence plaintiff must rely on rights which flow from a marital relationship. Being in such a position she should not be entitled to anything for services as defendant's wife.

Plaintiff's action on the alleged oral agreement that defendant promised plaintiff both before and after the commencement of the divorce action which resulted in the interlocutory decree from Robert that if she would divorce Robert and marry him he would divide all his property with her and support her children presents, however, a different question.

---

that on a condonation of the offense on which the interlocutory judgment was based the parties resumed the marital relation, it does not follow that the court, after the lapse of a year, has jurisdiction to vacate an interlocutory judgment, the integrity of which, insofar as it determines the facts properly involved therein, is unaffected by subsequent relations of the parties. The facts having been thus finally adjudicated, the judgment can be set aside only by a proceeding in the nature of a direct attack." (16 Cal.Jur.2d, Divorce and Separation, § 127.)

A husband and wife may agree with each other as to their property rights[4] and of course defendant is not liable for the support of plaintiff's children by Robert in absence of an agreement, adoption or some other arrangement. She might under such an agreement obtain an interest in defendant's separate property as well as the community property as support for her children by Robert to which she would not otherwise be entitled. Here the court nonsuited plaintiff on her action on the agreement on the ground that it was promotive of divorce and hence void and unenforceable. The court stated, however, "May I point out here, to you, that the Plaintiff's testimony about the defendant's promises are [sic] clear? In cross-examination they are perhaps whittled down somewhat, but it would be wholly improper for me to find he did not make such promises from this state of the evidence. . . . You may presume that the promises were made. My problem is, what is the effect of the promises? What is public policy in permitting recovery under such promises?" The court found that: "The parties stipulated that the plaintiff would testify that during all of the time . . . to and including the date of the decree of divorce between plaintiff and Robert Seymon, the ends of matrimony between plaintiff and Robert Seymon had been defeated and the Seymons were existing in a state of discordance and unhappiness." The evidence shows that defendant made his promises both before and after the divorce action was commenced. There is sufficient evidence from which it could be found that defendant made the promises repeatedly and in part so that if she would marry him he would divide his property with her and support her children; as a part of his promises she was induced to claim no alimony from Robert (except a nominal sum) and no community property.

Plaintiff contends that since the promise was made after plaintiff decided on a divorce and had grounds therefor, the objects of that marriage had ceased and the agreement is enforceable; that in any case the agreement as to the support of the children is not void and is severable from the rest of

---

[4] "'Either husband or wife may enter into any engagement or transaction with the other, or with any other person, respecting property, which either might if unmarried. . . .'" (Civ. Code, § 158.)

"A husband and wife cannot, by any contract with each other, alter their legal relations, except as to property and *except* that *they may agree, in writing, to an immediate separation, and may make provision for the support of either of them* and of their children during such separation." (Emphasis added; Civ. Code, § 159.)

the agreement. Defendant contends that part of the agreement was that plaintiff would obtain a divorce from Robert and the fact that an action for divorce from him had matured and been commenced makes no difference since before the interlocutory decree and even thereafter there was the chance plaintiff and Robert would be reconciled.

Regardless of what the authorities may have heretofore stated in regard to the validity of an agreement made in contemplation of a divorce, a recent statement by this court of the general policy on this subject, is pertinent here: "Public policy seeks to foster and protect marriage, to encourage parties to live together, and to prevent separation. [Citations.] But public policy does not discourage divorce where the relations between husband and wife are such that the legitimate objects of matrimony have been utterly destroyed. [Citation.] In the absence of fraud, collusion or imposition upon the court, public policy does not prevent parties who have separated from entering into a contract disposing of their property rights which shall become effective only in the event one of the parties obtains a divorce, even though such a contract may be a factor in persuading a party who has a good cause for divorce to proceed to establish it." (*Hill* v. *Hill*, 23 Cal.2d 82, 93 [142 P.2d 417].) In *Howard* v. *Adams*, 16 Cal.2d 253, 255 [105 P.2d 971, 130 A.L.R. 1003], the contract was by appellant aunt to support plaintiff, her niece (who was married) and was: "Her [appellant's] conversation with plaintiff at this time, according to the latter's testimony was as follows: Plaintiff: 'I had driven over to my aunt's home with my three children; and I walked into her bedroom; and my aunt said, "My heavens, what has happened to your eyes?" I said, "Homer [plaintiff's husband] has blackened both my eyes; he has beat me up all over my body and threatened to kill the children; I am afraid of him; I cannot live with him any longer; I am going right down now to see an attorney and get a divorce." My aunt said, "You can't do that here; think of my banks; think of the Baldwin name having any scandal here"; and I said, "I have heard if I go to Reno, Nevada, to get a divorce, I can't get alimony." My aunt said, "Never mind about that; if you do that and go to Reno, Nevada, and get a divorce, I will support you the rest of your life; I will take care of the children and I will educate them." . . . I said that for her sake that I would do what she asked me to do.' " The court held that since plaintiff had already decided on the divorce and had grounds

therefor before the agreement was made it was not invalid. (See *Hill* v. *Hill, supra,* 23 Cal.2d 82, 90; see *Bradbury* v. *Bradbury,* 52 Cal.App.2d 547 [126 P.2d 673]; *Barham* v. *Barham,* 33 Cal.2d 416 [202 P.2d 289]; *De Burgh* v. *De Burgh,* 39 Cal.2d 858 [250 P.2d 598].)

We think the evidence was susceptible of an interpretation that the divorce from Robert was merely incidental to the agreement; that the main purpose of the agreement was for support of plaintiff and her children and division of property in return for her entering into a Mexican marriage ceremony with defendant which he led her to believe would be a valid marriage so that she as his wife and her children could live with defendant, and that the objects of the marriage with Robert had been destroyed and it was beyond saving when the promise by defendant was repeated; that there was little likelihood of reconciliation with Robert and the agreement did not bar such possibility. As so construed the agreement would not be against public policy or promotive of divorce. Of course since a nonsuit was granted, we are only concerned with the sufficiency of the evidence to establish a prima facie case on behalf of plaintiff.[5] While the foregoing authorities and those cited by defendant are not factually the same, we believe that reason and justice require the reversal of the judgment as to the oral agreement.

Plaintiff also complains that there should not have been any deduction from the award of community property to her of the sums used for her and her children's support during the period she and defendant lived together. That portion of the judgment cannot stand because of our decision as to estoppel and the validity of the support agreement. This changes the entire theory of the case and those matters will have to be redetermined on retrial in the light of our holding here. What action the court may take with reference to the agreement we cannot know inasmuch as a nonsuit was incorrectly granted and the matter is open for further proceedings.

Defendant claims that the evidence is insufficient to support the finding that plaintiff believed in good faith in the validity of her marriage to defendant between March 17, 1951, and September 22, 1952, at least after she consulted

---

[5]It may be mentioned that defendant did not plead the statute of frauds or object to the introduction of evidence of an oral agreement; what may be done on retrial we cannot foresee.

her attorney in this action on March 20, 1952. Her attorney told her, however, that the marriage lay in an "unsettled" field of law and he thought he could establish estoppel and plaintiff took his word for it. The court was justified in drawing the inference it did. Defendant further mentions that plaintiff could not so believe after the court declared they were not married at the hearing on the pendente lite support claim on May 29, 1952. She appealed from the order of denial and testified that she still believed she could establish the marriage as valid and the court later in August indicated the order might be reversed on appeal and the appeal was in good faith. Plaintiff testified on cross-examination: "Q. Nevertheless, despite the fact that you filed this lawsuit against Mr. Spellens, you continued to have sexual intercourse with Mr. Spellens? That is correct, is it not? A. Yes, because in my way of thinking, we were married. . . .

"Q. And that continued for some months, did it not? A. Yes." During the course of the trial on March 4, 1953, Annelen testified: "I am still sure I am married to Mr. Spellens." These facts and circumstances and this testimony amply support the finding that plaintiff believed in good faith that she and defendant were legally married up to the date of their final separation on September 22, 1952.

▇▇▇ Plaintiff appeals from a denial of her motion to vacate an order of the trial court striking or taxing the item of costs claimed in her cost bill of $220.60 for a daily reporter's transcript of the proceedings.[6] Plaintiff filed her cost memorandum including the item. Defendant moved to tax them. He objected to the item stating in his memorandum of points and authorities that reporter's fees for a daily transcript are not allowable unless ordered by the court and the court did not order them here. The court disallowed the item saying plaintiff was not entitled to it. However, a minute order had been previously made by the court during the trial which stated: "A daily transcript is ordered." Plaintiff moved to vacate the order taxing the item on the ground of mistake as to the existence of the minute order. In the uncontradicted affidavit of plaintiff's counsel it is stated that he was mistaken as to

---

[6] "'In civil cases the fees for reporting and for all other transcriptions ordered by the court to be made shall be paid by the parties in equal proportion, and either party at his option may pay the whole. In either case, all amounts so paid by the party to whom costs are awarded shall be taxed as costs in the case.'" (Gov. Code, § 69953.) There is thus no question that if the transcript was ordered by the court the cost could be recovered by the party entitled, plaintiff.

the existence of the court order for the transcript and did not discover it until the clerk's transcript on appeal was prepared; that at the time of the argument on the motion to tax the court expressed its intention to allow the item if the law would permit it. The motion to vacate was denied and plaintiff appeals.

Plaintiff relies on section 473 of the Code of Civil Procedure[7] and a claimed inherent power in the court to correct its orders. In *Ferry* v. *O'Brien,* 63 Cal.App. 620 [219 P. 467], the court held there was a case for relief for mistake under section 473 where there was a mistake as to the amount of the costs included by the one entitled thereto. It is said in *Lane* v. *Pacific Greyhound Lines,* 30 Cal.2d 914, 916 [187 P.2d 9]: "It is plaintiffs' position that the trial court had no power to grant defendants relief from default and permit them to file the second motion to tax costs. They argue, first, that section 473 of the Code of Civil Procedure can have no application to a motion to tax costs because such a motion is not a pleading within the language of the section which provides that application for relief 'must be accompanied by a copy of the answer or other pleading proposed to be filed.' It is settled, however, that, under the provisions of section 473, the court may relieve a party from the effect of a delay in taking procedural steps which do not involve pleadings. (See *Estate of Simmons,* 168 Cal. 390, 394 [143 P. 697]; *Pollitz* v. *Wickersham,* 150 Cal. 238, 243 [88 P. 911].) Relief from default has been allowed under the provisions of section 473 where a party failed to file a cost bill within the times provided in sections 1033 and 1034 of the Code of Civil Procedure. (*Soda* v. *Marriott,* 130 Cal.App. 589, 594 [20 P.2d 758]; *Potter* v. *City of Compton,* 15 Cal.App.2d 238 [59 P.2d 540]; *Kallmeyer* v. *Poore,* 52 Cal.App.2d 142, 153 [125 P.2d 924].) Insofar as granting relief from default in filing is

---

[7] "The court may, upon such terms as may be just, relieve a party or his legal representative from a judgment, order, or other proceeding taken against him through his mistake, inadvertence, surprise or excusable neglect. Application for such relief must be accompanied by a copy of the answer or other pleading proposed to be filed therein, otherwise the application shall not be granted, and must be made within a reasonable time, in no case exceeding six months, after such judgment, order or proceeding was taken.

"The court may, upon motion of the injured party, or its own motion, correct clerical mistakes in its judgment or orders as entered, so as to conform to the judgment or order directed, and may, on motion of either party after notice to the other party, set aside any void judgment or order." (Code Civ. Proc., § 473.)

concerned, there appears to be no reason for making a distinction between a cost bill and a motion to tax costs.'' We see no reason why if the timeliness of filing costs proceedings may be reached by section 473, a mistake clearly one of fact as to what the court had done with reference to making the cost item allowable, should not likewise be covered by the first sentence of the quoted portion of that section. The action here in disallowing the item for the transcript was in the language of that portion in that it was an order taken against him through his mistake. The court had power to decide the question and should have done so. We do not have a case of judicial error but merely one of mistake of fact as to what the court had done.

There has been some question whether an order denying relief under section 473 in a case where relief may be asked properly under that section is appealable. The correct rule is stated: ''. . . when a judgment or order is not appealable, it cannot be made reviewable by the device of moving to set it aside and appealing from an order denying the motion. This proposition stems from the rule that forbids a party to do indirectly what he may not do directly. Even where there is a right of appeal from a judgment or order, a party cannot ordinarily take an appeal from a subsequent order denying a motion to vacate the judgment or order complained of, under such circumstances that the motion merely calls upon the court to repeat or overrule the former ruling on the same facts. And if the grounds upon which the parties seek to have a judgment vacated existed before the entry of the judgment and would have been available on an appeal from the judgment, an appeal will not lie from an order refusing the motion. The party aggrieved by a judgment or order must take his appeal from such judgment or order itself, if an appeal therefrom is authorized by statute, and not from a subsequent order refusing to set it aside. The reason for denying an appeal in the latter case is not because the order on the motion to vacate is not within the terms of the statute allowing appeals, for it may be. Indeed, an order refusing to vacate a final judgment is in its very nature a special order made after judgment. But the right of appeal from the order is denied because it would be virtually allowing two appeals from the same ruling, and would, in some cases, have the effect of extending the time for appeal, contrary to the intent of the statute. A further reason is that the order on the motion is merely a negative action of the court

declining to disturb its first decision. The first decision being reviewable, the refusal any number of times to alter it does not make it less so.'' (3 Cal.Jur.2d, Appeal and Error, § 57.) ''. . . . And since a statute [Code Civ. Proc., § 473] makes express provision for a motion to vacate, an appeal may be taken from an order denying such motion where the judgment has been obtained through mistake, inadvertence, surprise, or excusable neglect. In every case where this course has been allowed, the order from which the appeal was permitted was technically within the class of orders made directly appealable by statute, that is, a special order after final judgment. In permitting a direct appeal, therefore, the court was merely relieving the appellant from a rule of practice to the effect that an order refusing to vacate a prior appealable order, although described as appealable by the statute, could not be made to take the place of an appeal from the original order.'' (3 Cal.Jur.2d, Appeal and Error, § 58.) (See also Witkin, California Procedure, vol. 3, pp. 2170 - 2173.)

Here the relief sought is not to have the court reconsider exactly what it had considered before on the cost bill; it is asked to consider that there was a mistake of fact when it made its cost order, and it considered the fact as contrary to what the record shows; that is not an effort to extend the time of appeal or obtain an appeal where none was available. The court must pass upon the question of the mistake and factors involved in relief under section 473. The appeal from the order of denial was therefore proper and the order must be reversed.

There may be some question whether the minute order for a daily transcript above referred to was the court's own order or because of a request by plaintiff; that is a matter that should be determined on reconsideration of the cost bill and order taxing costs.

▉ After the main action was commenced and was at issue in which the property rights of the parties were involved, defendant brought an action against plaintiff to recover possession of certain personal property;[8] plaintiff cross-complained claiming damages for ''abuse of process'' in the use of the provisional remedy of claim and delivery by defendant in that action for possession. The trial was consolidated with the main action heretofore discussed. The court found

[8]The parties will still be referred to as plaintiff and defendant as they are in the discussion of the main action.

that defendant was the owner of the property, possession of which was sought to be recovered by him, with the exception of an automobile, which was a gift from defendant to plaintiff, but it was the quasi-community property of plaintiff and defendant (presumably on the putative marriage theory heretofore mentioned); that defendant maliciously commenced the action knowing the issues of the right to the property were involved in the main action and caused a claim and delivery writ to issue and be served; that he had the sheriff come to the house with his writ where plaintiff was living (defendant was also present) and served the writ and placed a "seal" on the automobile and took an inventory of the other property claimed in the action, all without plaintiff's consent. Plaintiff got in touch with her attorney but the sheriff remained for several hours at the house and would not leave without the property until plaintiff's counsel obtained an order enjoining him from seizing the property. While the sheriff and defendant were there defendant said he would drop his proceeding for claim and delivery if plaintiff dropped the main action, that the action and claim and delivery proceedings caused plaintiff anguish and mental suffering to the damage of $500, together with punitive damages of $1,000 and $1,500 attorney's fees incurred by plaintiff in stopping the furtherance of the claim and delivery writ. Judgment accordingly followed from which defendant appeals. Defendant had deposited a cash undertaking of $16,000 in the claim and delivery proceeding and after entry of the judgment he moved to exonerate the undertaking. The court exonerated it to the extent of $12,000.

Treating the action as one for abuse of process it appears that the evidence is sufficient to support the findings and malice may be inferred from defendant's conduct, if it is required, in such an action or to make a case for punitive damages. While the sheriff did not actually seize the property except the automobile, he served the writ and in effect seized it, and it may be inferred that he was interfering with plaintiff's property right. The automobile was seized. Plainly it was done for the ulterior purpose of making things difficult for plaintiff so she would drop her main action. It was like a threat, not really to obtain possession of the property which he claimed as his own, but to coerce her with regard to the main action.

The rule with reference to the tort involved is stated

in *Tranchina* v. *Arcinas,* 78 Cal.App.2d 522, 525 [178 P.2d 65] : "This tort is thus defined in 3 Restatement of Torts, section 682, page 464 :

" 'One who uses legal process, whether criminal or civil, against another to accomplish a purpose for which it is not designed is liable to the other for the pecuniary loss caused thereby.

" '*Comment* :

" 'a. The gravamen of the misconduct for which the liability stated in this Section is imposed is not the wrongful procurement of legal process or the wrongful initiation of criminal or civil proceedings; it is the misuse of process, no matter how properly obtained, for *any purpose other than that which it was designed to accomplish.* Therefore, it is immaterial that the process was properly issued, that it was obtained in the course of proceedings which were brought with probable cause and for a proper purpose or even that the proceedings terminated in favor of the person instituting or initiating them. The subsequent misuse of the process, though properly obtained, constitutes the misconduct for which the liability is imposed under the rule stated in this Section.'

"So in 1 Cooley on Torts, fourth edition, section 131, pages 434-435 we read : 'If process, either civil or criminal, is wilfully made use of for a purpose not justified by the law, this is abuse for which an action will lie. The action will lie although the process was lawfully issued upon a valid judgment for a just cause and is valid in form. The grievance for which redress is sought arises in consequence of subsequent acts—the illegal and malicious abuse of the power conferred by the judgment and writ.'

"The rule is similarly stated in *Dean* v. *Kochendorfer,* 237 N.Y. 384 [143 N.E. 229, 231] by Mr. Justice Pound of the Court of Appeals :

" 'The gist of the action for abuse of process lies in the improper use of process after it is issued. *To show that regularly issued process was perverted to the accomplishment of an improper purpose is enough.'*

"To the same effect are 50 C.J. 612 ; 1 Am.Jur. 176 ; Prosser on Torts, § 98, p. 892 et seq.; *Coplea* v. *Bybee,* 290 Ill.App. 117 [8 N.E.2d 55] ; *Ash* v. *Cohn,* 119 N.J.L. 54 [194 A. 174] ; *Saliem* v. *Glovsky,* 132 Me. 402 [172 A. 4] ; *Defnall* v. *Schoen,* 73 Ga.App. 25 [35 S.E.2d 564] ; *Ellis* v. *Wellons,* 224 N.C. 269 [29 S.E.2d 884] ; *Nix* v. *Goodhill,* 95 Iowa 282 [63 N.W. 701, 58 Am.St.Rep. 434] ; *Kool* v. *Lee,* 43 Utah 394 [134 P.

906]; and cases collected in the notes in 80 A.L.R. 580 and 86 Am.St.Rep. 397; and cf. the dictum in *Crews* v. *Mayo,* 165 Cal. 493 at p. 495 [13 P. 1032]. . . . Whether malice is a necessary element of this tort has been questioned (50 C. J. 616-617; 1 Am.Jur. 179-180) but if malice is a necessary element it is settled that it may be inferred from the wilful abuse of the process (50 C.J. 616; 1 Am.Jur. 192; Prosser on Torts, 893-894; *Coplea* v. *Bybee, supra,* 290 Ill.App. 117 [8 N.E.2d 55, 59]; and cases collected in 80 A.L.R. 582).'' (Emphasis added.) Dean Prosser, University of California School of Law, has the following to say with the citation of many authorities: ''The action for malicious prosecution, whether it be permitted for criminal or civil proceedings, has failed to provide a remedy for a group of cases in which legal procedure has been set in motion in proper form, with probable cause, and even with ultimate success, but nevertheless has been perverted to accomplish an ulterior purpose for which it was not designed. In such cases a tort action has been developed for what is called abuse of process. . . .

''Abuse of process differs from malicious prosecution in that the gist of the tort is not commencing an action or causing process to issue without justification, but misusing or misapplying process justified in itself for an end other than that which it was designed to accomplish. The purpose for which the process is used, once it is issued, is the only thing of importance. Consequently in an action for abuse of process it is unnecessary for the plaintiff to prove that the proceeding has terminated in his favor, or that it was obtained without probable cause or in the course of a proceeding begun without probable cause. . . .

 ''The essential elements of abuse of process, as the tort has developed, have been stated to be: first, an ulterior purpose, and second, a wilful act in the use of the process not proper in the regular conduct of the proceeding. Some definite act or threat not authorized by the process, or aimed at an objective not legitimate in the use of the process, is required; and there is no liability where the defendant has done nothing more than carry out the process to its authorized conclusion, even though with bad intentions. The improper purpose *usually takes the form of coercion to obtain a collateral advantage, not properly involved in the proceeding itself,* such as the *surrender of property or the payment of money, by the use of the process as a threat or a club.* There is, in other words, a form of extortion, and it is what is done

in the course of negotiation, rather than the issuance or any formal use of the process itself, which constitutes the tort.'' (Emphasis added; Prosser on Torts, (2d ed.) p. 667.) This case falls squarely within these rules. The compensatory damages recoverable for abuse of process include mental suffering.( *Adelman* v. *Rosenbaum,* 133 Pa.Super. 386 [3 A.2d 15]; *Saliem* v. *Glovsky,* 132 Me. 402 [172 A. 4]; 1 Am.Jur., Abuse of Process, § 38.) *Lamb* v. *National Surety Co.,* 108 Cal.App. 297 [291 P. 647], is clearly distinguishable in that it did not involve the facts here present.

The award of attorney's fees presents another question however. Presumably the fees awarded included services for defending against the claim and delivery proceedings as well as obtaining the restraining order stopping the seizure of the property under the claim and delivery writ. The most recent discussion by this court with regard to the recovery of attorney's fees under various circumstances states the general rules: ''Ordinarily, fees paid to attorneys are not recoverable from the opposing party as costs, damages or otherwise, in the absence of express statutory or contractual authority. [Citations.] Section 512 of the Code of Civil Procedure, which sets forth the requirements of the undertaking to be furnished in claim and delivery, provides for the payment to the defendant 'of such sum as may from any cause be recovered against the plaintiff.' Section 667 of the Code of Civil Procedure permits either the plaintiff or the defendant in a replevin action to recover judgment for the possession of the property or its value and, in addition, damages for its taking and detention. [Citations.]

 ''It is clear that there is no express authority for the allowance of attorney's fees in claim and delivery, and the cases have uniformly refused to award such fees as damages in actions for the recovery of personal property.'' (*Le Fave* v. *Dimond,* 46 Cal.2d 868, 870 [299 P.2d 858].) What is there said is controlling although we are dealing with the tort of abuse of process rather than where an ultimately unsuccessful plaintiff uses claim and delivery. We find no statute or contract allowing attorney's fees for such torts and thus the judgment in that action must be reversed to that extent.

The orders denying costs, support and attorney's fees pendente lite during trial and on appeal except insofar as they allow attorney's fees to plaintiff on appeal are reversed; the judgment in the main action is reversed in the respects heretofore indicated; the order denying relief under section 473 of

the Code of Civil Procedure from the order taxing costs is reversed; the portion of the judgment allowing attorney's fees in the action for claim and delivery involving the possession of property and abuse of process, is reversed. In all other respects it is affirmed. The appeal from the order denying defendant's motion to vacate the order awarding costs and attorney's fees on appeal is dismissed. Plaintiff shall recover her costs on all appeals.

Gibson, C. J., Traynor, J., and Spence, J., concurred.

SCHAUER, J., Concurring and Dissenting.—*Estoppel to Deny the Validity of the Mexican Marriage.* I agree that the extension of the doctrine of estoppel to the facts of this case is appropriate, but I would make it unmistakably clear that here the marriage in respect to which the doctrine is being applied is absolutely void *ab initio.*

The conclusion in this respect is reached through reasoning as follows: Where the parties go through a marriage ceremony in reliance upon a void decree of divorce their marriage is no more "valid" than the marriage of the parties here where there was no judgment of divorce.[1] Therefore, as the opinion of Justice Carter indicates, public policy against bigamous marriage is no more disserved by a holding that defendant is estopped to deny the "validity" of the marriage here than it is by the more familiar holding that "The validity of a divorce decree cannot be contested by a party who has procured the decree or a party who has remarried in reliance thereon, or by one who has aided another to procure the decree so that the latter will be free to remarry." (*Rediker* v. *Rediker* (1950), 35 Cal.2d 796, 808 [7] [221 P.2d 1].) Note, however, that in the Rediker case, at page 808, we stated, "Since the application of the doctrine of estoppel presupposes the entry of a final decree, cases involving remarriage after the entry of only an interlocutory decree (*Sullivan* v. *Sullivan,* 219 Cal. 734, 736 [28 P.2d 914]; *Estate of Elliott,* 165 Cal. 339 [132 P. 439]), or with the first marriage unaffected by any

---

[1] Here there was an interlocutory decree but it is indisputable that, in this state, the interlocutory decree entered in a divorce action is in no sense a judgment of divorce. It neither purports to nor can affect the legal status of the parties as husband and wife. It is merely a determination, in so far as status is concerned, that a divorce "ought to be granted" and that one party or the other or both, after the expiration of a year from entry of the interlocutory decree, shall be "entitled to a divorce." (Civ. Code, §§ 131, 132; *De Burgh* v. *De Burgh* (1952), 39 Cal.2d 858 [250 P.2d 598].)

decree (*Anderson* v. *Anderson,* 7 Cal.2d 265 [60 P.2d 290]; *Brandt* v. *Brandt,* 32 Cal.App.2d 99 [89 P.2d 171]), are not in point.''

Broad statements to the effect that public policy favors the declaration of nullity of a bigamous marriage, even at the suit of the guilty party (see e.g., *Anderson* v. *Anderson* (1936), *supra,* 7 Cal.2d 265, 266 [2]; *Sullivan* v. *Sullivan* (1934), *supra,* 219 Cal. 734, 736 [3]), made without reference to the question of estoppel, should here yield to the apposite policy, stated as a conclusive presumption in the Code of Civil Procedure (§ 1962, subd. 3) that ''Whenever a party has, by his own declaration, act, or omission, intentionally and deliberately led another to believe a particular thing true, and to act upon such belief, he cannot, in any litigation arising out of such declaration, act, or omission, be permitted to falsify it.'' Defendant with full knowledge of the facts led plaintiff to believe that by going through a bigamous marriage ceremony she was acquiring the status and incident rights of a lawful wife. He should not now be permitted to rely, to her injury, upon her innocent bigamy.

It appears pertinent to observe that caution should be exercised in applying the doctrine of estoppel in favor of one spouse who goes through a bigamous marriage ceremony during the interlocutory period, i.e. after entry of the interlocutory decree determining *rights* but before granting or entry of the judgment of *divorce,* which alone affects the marital status. Plaintiff's ignorance of the invalidity in California of the Mexican marriage is conceivable in the circumstances of her lack of experience, defendant's representations as to his wide experience, and the facts that she relied upon defendant to and defendant did arrange for her procuring the interlocutory decree establishing her right to obtain a judgment of divorce after the one year waiting period and the advice of the Mexican attorney as to the validity of a Mexican marriage. Although it is obvious that a court should scrutinize with caution a claimed belief that an interlocutory decree which is incompetent to affect status permitted a remarriage in another jurisdiction before expiration of the waiting period, until which time neither party was even entitled to apply for the judgment of divorce in California, a plaintiff's knowledge of the facts concerning the invalidity of the void[2]

---

[2]As already mentioned, it must be recognized that here the marriage is void, as distinguished from merely voidable. (See Civ. Code, §§ 61, 80; see also §§ 63, 82, 86, 87.)

marriage will not always preclude invocation of the doctrine of estoppel against defendant. (See for example, *Dietrich* v. *Dietrich* (1953), 41 Cal.2d 497, 505 [13-15] [261 P.2d 269], where it was held that defendant was estopped to question the validity of an assumed-to-be void—but nevertheless granted and entered—divorce obtained by plaintiff.) Recognizing that here there can be no successful attempt to give validity to the absolutely void Mexican "marriage," we hold that defendant is estopped to assert its unquestionable invalidity.

*Temporary Support and Counsel Fees and Costs Pendente Lite.* Since the estoppel was shown and the husband's ability to pay was stipulated when the wife sought support *pendente lite,* attorney's fees and costs, I agree with the proposition (*ante,* p. 222) that such relief should have been granted.

*Appealability of the Order denying Defendant's Motion to Vacate the Allowance of Counsel Fees and Costs on Appeal.* Defendant's appeal from the order denying his motion to vacate the order granting attorney's fees and costs on appeal is properly dismissed since the motion merely called upon the court to repeat or overrule its previous ruling on the same facts. (*Litvinuk* v. *Litvinuk* (1945), 27 Cal.2d 38, 44 [7] [162 P.2d 8].) As the majority opinion points out (*ante,* p. 228-229) an appeal from an order denying a motion to vacate an appealable order does not lie where the grounds on which the moving party sought to have the order vacated existed before its entry and were available on appeal therefrom. (*Colbert* v. *Colbert* (1946), 28 Cal.2d 276, 281 [8] [169 P.2d 633].)

*Disposition of Plaintiff's Cause of Action Based on Fraud and the Theory that she is a Putative Wife.* I further agree with the holding (*ante,* p 222) that since recovery is to be allowed on the view that defendant is estopped to deny the validity of the marriage, there can be no recovery for fraud inducing the marriage or as a putative wife. She cannot both eat her cake and have it too.

*Defendant's Agreement to Divide his Property with Plaintiff and to Support Plaintiff and her Children.* I dissent from the holding (*ante,* p. 222-225) that plaintiff can recover on defendant's alleged oral agreement to divide his property with plaintiff and to support plaintiff and plaintiff's children. In my view the agreement was invalid because it was promotive of divorce. At the inception of these proceedings plaintiff, by pleading, offer of proof, and testimony, took the position that defendant's promises induced the obtaining of the interlocutory decree and the terms which she sought and was

granted by such decree, as well as the subsequent Mexican marriage ceremony. She took this position in her first amended complaint,[3] at the first hearing on the questions of temporary support and costs and attorney's fees *pendente lite*,[4] and at

[3]The first amended complaint alleges:

Defendant Sol "insisted upon a divorce of plaintiff and her former husband, for which divorce Sol . . . paid, furnishing the attorney for plaintiff therein, and directing and advising plaintiff in the conduct thereof including the arrangements for property settlement, alimony and support therein.

"In the course of directing and advising plaintiff in the conduct of said divorce as aforesaid, Sol . . . directed and advised plaintiff to waive her interest in the community property of her former marriage . . . and to waive all alimony and support for her minor children (excepting only nominal amounts . . .) for the reason that, and Sol . . . expressly represented to plaintiff that, he would provide plaintiff as his wife and in consideration of her services to him as a wife, with an equal interest in his property and with support and maintenance for herself and her aforesaid minor children, following marriage to him.

"Said direction, advice and representation to plaintiff was intended by Sol . . . to induce, and did in fact induce plaintiff to waive her aforesaid interest and rights of alimony and support for herself and her minor children, in connection with the divorce of plaintiff and Robert Seymon, thereafter occurring.

"Thereafter Sol . . . induced plaintiff to enter into her aforesaid marriage with him upon the basis of, and relying on, his express prior representation and promise to plaintiff that in consideration of marriage and plaintiff's services to Husband as a wife, he would provide plaintiff with an equal interest in his property, and with support and maintenance for herself and her aforesaid minor children."

[4]At this hearing plaintiff made the following offer of proof:

Before plaintiff obtained her interlocutory decree of divorce from Seymon, defendant told plaintiff "That he could see that their [plaintiff's and Seymon's] marriage was an unhappy one . . . , that if she would marry him, that he would provide security for her and her children. That her husband was incompetent to support the family . . . [T]he plaintiff resisted his blandishments for a period of time . . . and that subsequently he asked her to tell her husband a false reason why she wanted a divorce from him and a false statement of the defendant's proposal . . . [F]inally, as a result of these various proposals, she told her husband, with the knowledge of the defendant, the proposal that had been made to her in its entirety and asked her husband whether he wouldn't reform so that they could continue the marriage . . . [I]nstead of taking the opportunity, her husband admitted his incompetence, that he didn't feel he would be an economic success . . . , and he frankly suggested that she take advantage of the offer made by the defendant and obtain a divorce from him.

"That she reported those facts to the defendant, who then instructed her with regard to the kind of property settlement agreement she should have, and the arrangements she should have with her husband.

"That he instructed her that she wouldn't need to retain her interest in her home . . . He told her she wouldn't need alimony . . .

"He instructed her she wouldn't need support for the children because he would support the children . . .

"That thereafter he instructed her what attorney to go to and made prior arrangements with that attorney as to handling the divorce suit, gave her the money to pay for the divorce action, and that she reported back to him on every single stage of that divorce action . . ."

the second hearing on the questions of temporary support and costs and attorney's fees *pendente lite.*[5]

Although the trial court found "that on a number of occasions prior to October, 1950, plaintiff threatened to divorce Robert Seymon," it is manifest that plaintiff's final decision to divorce Seymon was not made solely pursuant to these "threats" and independent of defendant's promises and "blandishments."

It ignores reality to say that it could properly be found that defendant made two independent sets of promises to divide his property and support plaintiff's children and that plaintiff went through the marriage ceremony in reliance solely on the promises made after she had obtained her interlocutory decree of divorce and not upon the promises which induced her to obtain the interlocutory decree. In my estimation it cannot fairly be said, as the majority opinion says (*ante,* p. 225) that "the evidence was susceptible of an interpretation that the divorce from Robert was merely incidental to the agreement"; rather, the procuring of the interlocutory decree was an integral and essential part of the agreement. This case is not like *Howard* v. *Adams* (1940), 16 Cal.2d 253, 256-257 [2] [105 P.2d 971, 130 A.L.R. 1003]. There plaintiff had already decided on a divorce when defendant, plaintiff's aunt, promised to support plaintiff and her children in consideration of plaintiff's obtaining the divorce in Nevada. Here it cannot fairly be said that there was any evidence that plaintiff had definitely decided to divorce Seymon before defendant's promises induced such decision. Nor is this case like *Hill* v. *Hill* (1943), 23 Cal.2d 82, 86-94 [142 P.2d 417] [property settlement between parties who had separated; before the making of the agreement the husband had sued for divorce and the wife had cross-complained for separate maintenance], or *Kreiger* v. *Bulpitt* (1953), 40 Cal.2d 97, 100-101 [2, 3] [251 P.2d 673] [contingent fee contract to defend in

---

[5]At the second hearing plaintiff testified as follows: About four months prior to plaintiff's obtaining a divorce defendant "told me . . . I had to divorce my husband and he would give me all security and everything *what* a woman wanted, and for the children an education . . . [H]e would give me everything and would make me a full fledged partner if I would consider marriage to him. . . . Then he called me and called me and repeated his offer all the time for quite a while until I finally told him I would talk to my husband and tell him what he had suggested. . . ." Plaintiff discussed the proposal with Seymon, and told defendant that she had given Seymon "three months time to improve our condition." She finally decided on a divorce from her husband, informed defendant, and defendant made arrangements for the divorce.

divorce proceeding which had been instituted before the making of the contract]. I would uphold the trial court in its ruling that plaintiff should be nonsuited as to her cause of action based on defendant's oral agreement.

As to the statement in the majority opinion (*ante*, pp. 225-226) that "Defendant claims that the evidence is insufficient to support the finding that plaintiff believed in good faith in the validity of her marriage to defendant[6] between March 17, 1951, and September 22, 1952, at least after she consulted her attorney in this action on March 20, 1952." I would note that defendant cannot effectively assert a lack of good faith belief of plaintiff in the validity of her marriage before March 23, 1952, because defendant in his notice of appeal in the main action stated that "Defendant specifically does not appeal from that portion of the Judgment herein adjudging that plaintiff was the putative wife of defendant . . . during the period March 17, 1951, to and including March 23, 1952." The fact that plaintiff was advised by her attorney on March 20, 1952, that the validity of her marriage "lay in the field of unsettled law" does not preclude her from invoking the doctrine of estoppel.

*Relief under Section 473 of the Code of Civil Procedure from the Order Taxing Cost of Transcript and Appealability of Order Denying Relief under Section 473.* I concur in the holding (*ante*, pp. 226-228) that the order taxing the cost of a daily reporter's transcript may be corrected under section 473 of the Code of Civil Procedure (unless it is shown on reconsideration of the order taxing costs that, as defendant argued in the trial court and suggests on appeal, the minute order, "A daily transcript is ordered," did not correctly reflect the order of the court). Further, I agree with the holding (*ante*, pp. 228-229) that the order denying plaintiff relief under section 473 is appealable.

*Maintenance of the Action for Abuse of Process.* I agree in part with the reasons advanced in the majority opinion (*ante*, pp. 229-233) for the holding that plaintiff can recover in her cross-action for abuse of process. Not discussed in the majority opinion (or by the parties) are the questions whether the action for abuse of process is for injury to property or for personal injury and whether, if it is for personal injury, it can be maintained by a wife (or one who by successfully

---

[6]This fact could be a crucial one, at least as to some of the relief sought. (See Civ. Code, § 87.)

asserting the doctrine of estoppel is in the position of a wife) against a husband (or one who is estopped to deny that he is a husband). It appears clear to me that plaintiff's action for abuse of process was intended by her to be and was for personal injury, that is, for mental suffering. Plaintiff in her cross-complaint did not allege any damage to property. She alleged that she "suffered mental anguish, nervous and emotional shock and strain and was humiliated, embarrassed and exposed to public shame." The trial court found that she "suffered mental anguish and nervous and emotional shock and strain, and was humiliated and embarrassed." It therefore appears that although the abuse of process action grew out of the misuse of process in claim and delivery, an action relating to property, the abuse of process action was in essence for an injury to person, not property. (*Cf. Langley* v. *Schumacker* (1956), 46 Cal.2d 601, 603 [3] [297 P.2d 977], characterizing an action for fraud as one for injury to property although, as the dissenting opinion points out at p. 607 of 46 Cal.2d, allegations that plaintiff suffered humiliation, disgrace, mental anguish and became ill show that the action was essentially for injuries to the person.)

It is currently the rule of this state that one spouse can sue the other for injury to property, but not for injury to person. (*Peters* v. *Peters* (1909), 156 Cal. 32, 36 [103 P. 219, 23 L.R.A.N.S. 699] [action for battery not allowed]; *Paulus* v. *Bauder* (1951), 106 Cal.App.2d 589, 591-592 [1] [235 P.2d 422] [action for injury in automobile accident sustained during interlocutory period not allowed]; *Cubbison* v. *Cubbison* (1946), 73 Cal.App.2d 437, 438 [1] [166 P.2d 387] [action for injury in automobile accident not allowed].) The rule of interspousal immunity for personal torts was recently applied in *Watson* v. *Watson* (1952), 39 Cal.2d 305 [246 P.2d 19]. It is there held that plaintiff was estopped to deny the validity of a Nevada divorce which he had procured and in reliance on which he had gone through a marriage ceremony with defendant (p. 307 [2, 3]). Therefore, it is further held, plaintiff could not sue defendant for malicious prosecution even though the marriage of plaintiff and defendant was bigamous and void.

If interspousal disability to maintain an action for personal tort is to remain the rule of this state, then that rule should apply here. If plaintiff is allowed to invoke the doctrine of estoppel in order to pursue a separate maintenance action, it is proper that that doctrine should apply in her tort action.

However, as hereinafter explained, this court could well consider overruling the holding of *Peters* v. *Peters* (1909), *supra,* 156 Cal. 32, 36, and the cases which follow it.

The reasons given in the Peters case, *supra,* (pp. 35-36 of 156 Cal.), for not permitting suits between spouses for personal torts are that such suits would destroy "conjugal tranquility" and that if the rule of the common law (which did not permit such suits) is to be changed it should be by the clear language of a statute. The rule of interspousal immunity for torts has been tellingly criticized, and a minority of jurisdictions now permit tort actions between spouses for personal as well as property torts. (See Prosser, Law of Torts (2d ed.), pp. 674-675; McCurdy, *Torts Between Persons in Domestic Relation* (1930), 43 Harv.L.Rev. 1030, 1045, 1050-1053; 43 A.L.R.2d 632.)

I would prefer to reexamine the common law view of interspousal immunity and refuse to apply it to this case, rather than distort plaintiff's action for damages to her feelings into an action for damage to property. None of the reasons which have been suggested in support of the common law view apply to this action. As this litigation demonstrates, any conjugal harmony of this quasi-marriage has long since been disrupted. Certainly there can be no thought of collusion between these parties. The court should not decline to entertain a meritorious action against a spouse (or one who, like defendant here, is estopped to deny that he is a spouse) because of the dubious apprehension that in some future case trifling domestic difficulties may become the subject of litigation.

It has been suggested that because recovery by plaintiff "spouse" for personal injuries inflicted by defendant "spouse" would be community property (*Flores* v. *Brown* (1952), 39 Cal.2d 622, 630 [8] [248 P.2d 922]; *Zaragosa* v. *Craven* (1949), 33 Cal.2d 315, 320 [2] [202 P.2d 73, 6 A.L.R. 2d 461])[7] "defendant spouse would then [if recovery from him was permitted] in effect be taking the money out of one

---

[7]A spouse's cause of action for personal injuries, it may be noted, is treated differently from other community property in the event of the death of the other spouse (*Kesler* v. *Pabst* (1954), 43 Cal.2d 254, 258 [4] [273 P.2d 257]), or of divorce (*Washington* v. *Washington* (1956), 47 Cal.2d 249, 252 [3] [302 P.2d 569]).

By statutory amendment in 1957 applicable to actions commenced and causes of action arising after effective date of the act, all damages awarded a married person in a civil action for personal injuries are the separate property of such married person. (Stats. 1957, chap. 2334, adding Civ. Code, § 163.5 and amending Civ. Code, § 171c.)

pocket and placing it in the other, resulting in unnecessary circuity." (Comment, *Interfamily Tort Immunity in California* (1956), 3 U.C.L.A. L.Rev. 371, 373-374.) This suggestion should constitute no objection to the maintenance of plaintiff's action for abuse of process. Plaintiff acquired the judgment for abuse of process after she and defendant had finally separated. It was, therefore, her separate property under the rule that "The earnings and *accumulations* of the wife . . ., while she is living separate from her husband, are the separate property of the wife" (italics added). (Civ. Code, § 169; see *Christiana* v. *Rose* (1950), 100 Cal.App. 2d 46, 55-56 [7, 8] [222 P.2d 891].)

Suggestions that any change in the rule of the Peters case (1909), *supra,* 156 Cal. 32, should come from the Legislature (*Paulus* v. *Bauder* (1951), *supra,* 106 Cal.App.2d 589, 592; *Cubbison* v. *Cubbison* (1946), *supra,* 73 Cal.App.2d 437, 438) are not persuasive. The rule was originally formulated by this court in reliance upon a now outmoded common law rule, and if this court becomes convinced that the rule is unwise it should see fit to change it. (See *Brown* v. *Gosser* (1953, Ky.), 262 S.W.2d 480, 484, 43 A.L.R.2d 626, 631.)

*Recovery of Attorney's Fees incurred in the Claim and Delivery Action as Damages in the Cross-Action for Abuse of Process.* I agree with the majority's refusal (*ante,* p. 233) to extend the normal rule that attorney's fees are not recoverable as costs, damages, or otherwise in the absence of express authority or statute or contract.

In my view the appeals should be disposed of as follows:

In L.A. 22553, the order denying support, attorney's fees and costs pending trial should be reversed; plaintiff's appeal from "All orders . . . incident or leading to the aforesaid orders" should be dismissed.

In L. A. 23135, defendant's appeal from the order denying his motion to vacate the order that he pay attorney's fees and costs on appeal should be dismissed.

In L. A. 23180, the order that defendant pay counsel fees and costs should be affirmed; the order denying plaintiff's request for support pending appeal should be reversed.

In L. A. 23717, the order denying plaintiff's motion for relief (under Code Civ. Proc., § 473) from the order taxing costs should be reversed; plaintiff's appeal from "All orders . . . incident or leading to the aforesaid order" should be dismissed.

In L. A. 23683, the main action, I would reverse the judg-

ment for further proceedings consistent with the views above expressed. Plaintiff's appeal from ''All of the orders and rulings of the Court leading to, or incident to the . . . portions of the judgment'' from which plaintiff appeals, except the appeal from the order ''denying to the plaintiff her necessary support, attorney's fees and costs upon the trial'' should be dismissed.

In L. A. 23684, the claim and delivery action and plaintiff's cross action for abuse of process, the judgment should be reversed insofar as it permits recovery of attorney's fees; in other respects it should be affirmed.

In L. A. 23685, so much of the order as denies plaintiff alimony, counsel fees, and costs on appeal should be reversed. Plaintiff also appeals from a portion of the order which denies injunctive relief, but since she has not prosecuted this appeal in her briefs this portion of the order should be affirmed.

McComb, J., concurred.

The petition of appellant Sol Carl Spellens for a rehearing was denied November 26, 1957. Schauer, J., and McComb, J., were of the opinion that the petition should be granted.