[Civ. No. 3538. Third Appellate District.—September 4, 1928.]

MERLE P. RANDLEMAN, Respondent, v. MATILDA BOERES, Appellant.

746

Gilbert E. Boreman and Wm. J. Clark for Appellant.

Benjamin Elconin and Arch G. McLay for Respondent.

THOMPSON (R. L.), J., *pro tem.*—This is an appeal from a two thousand dollar verdict of a jury rendered in an action for malicious prosecution instituted against the appellant on a charge of burglary. The record is devoid of substantial evidence to support the necessary elements of malice or lack of probable cause, and the judgment must, therefore, be reversed.

The appellant resided with her husband and daughter in a cottage at Huntington Park, Los Angeles. The respondent was twenty-two years of age and unmarried. He lived with his parents about a block from the residence

of appellant. These families were not acquainted. The appellant had never spoken to the respondent, although she knew who he was. There was no previous association between them, except that upon a single occasion she and her daughter were introduced to the respondent at a party given the previous May by a neighbor, during which the respondent invited appellant's daughter to dance with him, which she declined to do. There was no criticism or adverse comment against the respondent by any member of the appellant's family. The record affirmatively refutes the inference of any conduct or declarations on the part of appellant which would indicate malice, ill will, or spite toward the respondent. The appellant did not even recall his name. He was referred to in her household, with no disparaging intent, as Rudolph Valentino. This was a mere nickname.

August 13, 1924, about 2 o'clock A. M., the home of appellant was burglarized. Her husband was a traveling man. He had planned to leave by train for Riverside, very early that morning. They retired at 11 o'clock the previous evening, sleeping in a double bed, in a room adjoining the living-room. The gray trousers of Mr. Boeres, containing a purse with small change and a bill-fold pocketbook containing two ten-dollar greenbacks, a railroad ticket and some business cards were thrown upon the chiffonier. The bedroom contained three windows, the shades of which were raised, permitting the bright moonlight which existed that night to illuminate the room so that all objects therein could be clearly discerned. Some time after midnight the appellant was aroused by the barking of dogs. She testified that she was restless and lay awake much of the night, impressed with the responsibility of calling her husband in time for the early train. He also had been aroused by the barking of dogs, but was sound asleep at the time of the entry of their room by the burglar. Suddenly, without previous warning, their bedroom door communicating with the living-room was silently opened, a man stealthily entered and passing the foot of the bed, hastened to the chiffonier and seized the trousers, which he threw across his left arm, and hurried out of the room. A small purse, wristwatch, and ring which were lying upon the dresser were untouched. In passing the bed the burglar raised his coat collar with his right hand to conceal his face. During this occurrence the appellant

lay frightened and silent. She testified, however, that she had a clear view of the burglar's face and recognized the respondent. She was positive of his identity. He wore a dark blue or black suit of clothes with a gray cap. The moment he left the room she sprang from the bed screaming "There is a man in the house," and rushed to the closet to get a gun. The commotion awakened her husband, who exclaimed, "What is the matter?" Amid this confusion the daughter entered the room from her adjoining bedroom, crying, "Mamma, what is the matter?" To which the appellant excitedly rejoined, "Rudolph Valentino took your father's trousers." After some conversation the daughter asked if she should call an officer, to which the appellant assented. The daughter immediately telephoned the news of the burglary to the sheriff's office. Three detectives were at once detailed to investigate the matter, and soon arrived at the Boeres' residence. Upon their arrival the appellant related the circumstances to these officers, and stoutly maintained that she saw his features and identified the burglar. She referred to him as Rudolph Valentino, but someone present suggested that his name was Merle Randleman. She told them where the respondent lived on Live Oak Street about a block away, and within an hour of the time of the burglary, at about 2:30 or 3 o'clock A. M. they called at his residence. Mrs. Randleman, his mother, was up attending to her husband who was suffering from an attack of asthma and she answered the doorbell. She told the officers that her son had gone to a show the night before, but reached home and had retired at 10 o'clock. The respondent was called and informed the officers that he drove his car to the Lyric Theater about 7 o'clock the previous evening, and that he had stopped at a drug-store for an ice-cream soda on the way home, but that he was in bed by 10 o'clock and had been asleep ever since that time. His story apparently constituted a complete alibi and was corroborated by both of his parents. Subsequently, however, he told the officers, Jones and Higgins, that he arrived home the night of the burglary about an hour before the officers called at his home. He also failed to account for a flat pass-key which the officers found upon his key ring. The officers returned to the Boeres residence and informed appellant that the Randleman family had told them the respondent had

gone to bed at 10 o'clock on the previous evening, and in regard to her claim that she had recognized him as the burglar it would merely be her word against their flat denial, and that she might get into trouble by charging him with the crime. In the morning Mr. and Mrs. Boeres, in company with Officer Purrier, carefully searched the premises for further evidence of the crime. She pointed out distinct finger-prints appearing in a smudge of black grease which she found upon the white enamel of the outer door jamb. A footprint outlined in dirt or sand was seen upon the bedroom rug. A tool-chest of the daughter's automobile which had been parked in the rear of the building was found open. A vial of chloroform in a bottle labeled ''pills'' was found in the grass at the rear of the dwelling. The tracks, identified by respondent's witness Lowther as those of a man followed across the premises to a neighbor's fence, where the shrubbery was broken and where early the morning of the burglary Mrs. Van Wert had found the purse belonging to Mr. Boeres, together with some papers near the fence. These foot-tracks continued beyond the fence across the adjoining lot. While this group were talking at the Van Wert fence, Mrs. Duncan, who lived in a cottage two or three houses beyond, observing them, inquired what had happened. Mrs. Boeres, or someone else in the group, replied that they had been robbed. Mrs. Duncan then asked if they had lost a pair of gray trousers. Upon being assured that they had, she said her husband had discovered a pair that morning under a walnut tree in their back yard. These proved to be Mr. Boeres' trousers. The bill-fold purse, however, was not found. The Duncan premises, where the trousers were found, were directly in the course of the tracks of the burglar, which ran in the general direction of the Randleman home. The officer, Purrier, testified: ''The entrance (to appellant's home) was gained via pass key—side entrance. . . . Criminal ran in a northeasterly direction across center of block to a point opposite the house of Merle Randleman (the respondent), thence turning in the direction of his place, the tracks disappearing in the lawn across the street, though proceeding toward (respondent's) house.''

Because of the warning given to appellant by the detectives, she abandoned the effort to prosecute the case, and nothing further was done regarding the matter for about two

months. October 9, 1924, Mr. Jones and Mr. Higgins, members of the burglary squad from the sheriff's office, voluntarily visited appellant's home in the process of checking up on the neighborhood burglaries which had been reported, in which no action had been taken. During this interval the appellant had shown no activity or interest in prosecuting the criminal case. At the request of the officers she once more related the circumstances of the affair, asserting her belief that she had recognized the respondent as the burglar. They asked her why she had not filed a charge against him, and she told them that the other detectives had told her she might get into trouble because of the likelihood of respondent's acquittal on proof of his alibi. Jones told her that if she was still willing to file the charge, they would go with her to the magistrate. At the officer's suggestion, and because of their encouragement, she did accompany them to the office of Justice Miller, where she again related the facts of the case. He prepared a complaint charging the respondent with burglary, and she signed and swore to it. A warrant of arrest was issued and served upon the respondent. He was taken into custody and imprisoned for about one day, when he was released on bail. In due time the preliminary hearing took place, at which both the appellant and the respondent were sworn as witnesses. The defense of an alibi was urged by the respondent, but the magistrate, in the exercise of his judgment, assuming there was probable cause to believe that he was guilty of the charge, bound him over for trial in the superior court. At the trial, which occurred January 13, 1925, the accused was acquitted, either because the jury was not satisfied of his guilt beyond a reasonable doubt or because they thought he was innocent. This action for malicious prosecution was subsequently instituted.

Upon trial of the present action the jury rendered a judgment of two thousand dollars against the appellant for malicious prosecution, and also adopted special findings to the effect that her prosecution of the accused was actuated by malice; that her charge against him was false, and that no burglary was in fact committed. It is difficult to account for these extravagant findings. After a careful reading of the entire record we are persuaded that a burglary was committed as charged by the appellant; that there is absolutely

no evidence to indicate malice on her part toward the respondent, and that there is no substantial proof of a lack of probable cause to believe that the accused was guilty of the crime. The case of *Johnson* v. *Southern Pacific Co.*, 157 Cal. 333 [107 Pac. 611], defines the term "probable cause" as "a suspicion founded upon circumstances sufficiently strong to warrant a reasonable man in the belief that the charge is true."

It may be conceded that, independent of the belief of appellant that she had recognized the burglar, the remaining circumstances fail to furnish probable cause to assume that he was guilty. It may be further conceded that the appellant was mistaken in her identity of the burglar. █ But an honest belief, reasonably founded, that one has clearly recognized an individual in the actual commission of a crime, secured by means of a close view of his features in the bright moonlight, furnishes probable cause to assume his guilt, without further circumstances. In the present case, however, further facts in addition to appellant's recognition of the burglar appears to warrant the conclusion that she had probable cause to believe in his guilt. The footprints of a man wearing a shoe about the size of respondent's were traced by the detective Purrier from the scene of the burglary "across the center of the block to a point opposite the house of Merle Randleman, then turning in the direction of his place . . . toward his house." Along this trail were found the stolen purse and trousers. Respondent's prosecution of this action and his defense of the judgment on appeal are based entirely upon his contention that the appellant fabricated her entire story of the crime; that the burglary did not occur, and that she perjured herself in swearing to the identity of the respondent. But there is no evidence to support this fanciful theory, except some slight, immaterial contradictions in the testimony. In an illogical effort to escape from a total absence of proof of malice and a lack of probable cause, the respondent in his brief says: " . . . The same brain that framed and fabricated and foisted this 'pipe dream' on the jury, also arranged for the planting of the trousers and the planting of the purse." This extravagant language is in direct conflict with the undisputed testimony of the record. The evidence affirmatively shows that the appellant had no malice

or ill will toward the respondent and no motive for fabricating her story of the crime. A finding or charge of fraud and perjury must be based upon substantial proof. It was a man's finger-prints which were found in the grease on the door jamb. It was the tracks of a man's shoes which led along the trail where the stolen articles were found. The stolen trousers and purse were discovered and reported by different neighbors whom the appellant scarcely knew. There was sufficient genuine excitement and criminal clews, difficult to counterfeit, to convince a bevy of expert officers that a crime had been actually committed. No sensible person can read the record with an unprejudiced mind without being convinced that a genuine burglary was committed and that the appellant and her family were victims of the crime. The general verdict of a jury has no firmer foundation than the record of the evidence adduced at the trial. A specific finding that malice existed, or that the appellant perjured herself, cannot aid the general verdict, in the absence of substantial evidence, to support these findings. The record fails to support these special findings.

The burden is always upon the plaintiff to prove both want of probable cause and malice. While malice may be inferred from a lack of probable cause, it is a question of fact which must be established by proof like any other material fact. (*Griswold* v. *Griswold*, 143 Cal. 617 [77 Pac. 672].) Upon the contrary, a want of probable cause may not be inferred from the mere existence of malice. (*Franzen* v. *Shenk*, 192 Cal. 572, 611 [221 Pac. 932].) One may possess malice toward an accused, and yet have such probable cause to believe in his guilt as to warrant a prosecution of the crime. In an action for malicious prosecution it is necessary for the plaintiff to show affirmatively both malice and a lack of probable cause. (*Cooper* v. *Armour*, 42 Fed. 215 [8 L. R. A. 47]; *Ricord* v. *Central Pac. Ry. Co.*, 15 Nev. 167.) In the present case the appellant established a *prima facie* showing of probable cause by proof of the fact that at a preliminary hearing the accused was duly held by the magistrate for trial in the superior court. It is settled law that this showing constitutes a *prima facie* existence of probable cause. (*Johnson* v. *Southern Pacific Co.*, 157 Cal. 333, 339 [107 Pac. 611]; 18 R. C. L. 42, sec. 25.) Upon the contrary, "The great weight of author-

ity and reason is that the mere fact of the acquittal of the defendant upon the trial of a criminal charge, is not *prima facie* evidence of the want of probable cause for the prosecution." (18 R. C. L. 40, sec. 23.)

In the present case the respondent utterly failed to support the burden resting upon him to show either that appellant's prosecution of him was actuated by malice, or that the criminal proceeding was instituted without probable cause. For this reason the judgment is reversed.

Plummer, J., and Finch, P. J., concurred.

A petition for a rehearing of this cause was denied by the district court of appeal on October 4, 1928, and a petition by respondent to have the cause heard in the supreme court, after judgment in the district court of appeal, was denied by the supreme court on November 1, 1928.

All the Justices present concurred.