[Civ. No. 41692. First Dist., Div. Two. May 1, 1979.]

CLARK EQUIPMENT COMPANY et al., Plaintiffs,
Cross-defendants and Appellants, v.
WILLIAM J. WHEAT et al., Defendants,
Cross-complainants and Respondents.

506

## COUNSEL

Bronson, Bronson & McKinnon and Donald R. Shane for Plaintiffs, Cross-defendants and Appellants.

Varni, Fraser, Hartwell & Van Blois, Varni, Fraser, Hartwell & McNichols, Stephen L. R. McNichols, Jr., and David P. Lanferman for Defendants, Cross-complainants and Respondents.

## OPINION

**TAYLOR, P. J.**—Clark Equipment Company (Equipment) and Clark Leasing Corporation (Leasing) appeal from adverse judgments on separate jury verdicts in favor of William J. Wheat and Ernest R. Wheat (Wheat) for $4,500 and $5,000, respectively, for compensatory damages against Equipment, and for $500 each, in compensatory and $5,000 each, in punitive damages against Leasing on Wheat's cross-complaint for fraud, misrepresentation, breach of contract and abuse of process. Leasing argues that the evidence did not support the adverse judgment as to either compensatory or punitive damages; or, alternatively, that there was no basis for the award of punitive damages. Equipment argues that the adverse judgments erroneously based the award of damages on alternative and mutually inconsistent theories and, in any event, that Wheat had been awarded damages for the breach of a contract which was not enforceable, as it violated the statute of frauds (Civ. Code, § 1624). For the reasons set forth below, we have concluded that the judgments on the verdicts against Leasing and Equipment must be affirmed.

Although there are some contentions concerning the sufficiency of the evidence to support the verdict and judgment, a brief review of the pertinent facts will suffice.

Viewing the record in favor of the judgment, as we must, the following appears: For over 20 years, Wheat had operated an auto dismantling yard in Hayward, California, dba E & J Auto Wreckers, in which forklift trucks are an essential tool. The forklifts are used to lift and load crushed automobiles onto a flatbed truck and to carry automobiles and automobile parts around the yard.

Equipment, a Delaware corporation, is a large manufacturer and sells forklifts; Leasing, also a Delaware corporation, is Equipment's wholly controlled domestic subsidiary which finances retail time sales of new and used trucks and other similar products to the consumer. Leasing (now called Clark Equipment Credit Corporation) has a net worth of $88,345,000.

In February of 1973, Wheat owned a 10,000 pound TY 100 forklift which had been purchased from Equipment four years before. As the volume of Wheat's business had increased, Wheat decided to purchase a second, smaller and more maneuverable lift. Ernest Wheat went to Equipment's outlet in Oakland and talked to Mr. Baptista, the salesman from whom he had purchased the TY 100. He advised Baptista that he needed a second smaller forklift to dismantle, lift, load and carry automobiles and automobile parts in his wrecking yard; he specifically indicated to Baptista that Wheat's business required a lift that would hoist at least 7,000 pounds 11 feet in the air.

Baptista indicated that he had a fully reconditioned York forklift which would meet these requirements and specifications. Wheat had owned a York TM 80 in 1970 and used it satisfactorily. Accordingly, on March 1, 1973, Wheat signed a $7,500 purchase order for the York forklift; the purchase order referred to an 11-foot upright standard, which meant that it would hoist 11 feet into the air. On March 7, 1973, Equipment wrote to Eldon Risser of Leasing to obtain approval of the transaction. On March 19, 1973, Risser replied to Mr. Coffee, Equipment's credit manager in Oakland, and approved the transaction. On Wheat's March 30, 1973 conditional sales contract for the York forklift, the words "Clark Leasing Corporation" appeared at the top of the printed agreement. The last pages of the printed agreement stated that it would be assigned to Leasing. However, in its body, Wheat's March 30, 1973 conditional sales contract stated that the seller was Equipment; the document purported to be signed by the branch manager of Equipment.

Uncontroverted evidence adduced at the trial indicated that Baptista made the representations to Wheat about the York forklift on March 1.

However, Equipment did not purchase the used York TM 70 from Nevada Forklifts until March 28. The sales order for the York TM 70 signed by Wheat on March 1, 1973, and the invoice both stated that the York lift would be "reconditioned" and "be able to lift 7,000 pounds 11 feet in the air." The used TM 70 arrived in the Equipment yard on March 30, 1973; no work was done on it until April 2, 1973. The TM 70 was delivered to Wheat on April 6, 1973. Thus, Equipment and Leasing's business records established that their agent Baptista had made representations regarding the capabilities and qualities of the York lift which at that time Equipment and Leasing had never seen and did not yet own.

The TM 70 was generally defective, including its engine, brakes and a rusted hoist. A new tire was required immediately and the engine stopped running after three days. In addition, it could hoist only about 4,000 pounds and could not lift anything above 8 feet in the air. After a car was hoisted and nearly dropped on someone working underneath because of the TM 70's defective ram, Wheat ceased using it. Before this time, Wheat expended $600 in repairing the lift and had complained to Baptista who promised to send a repairman. However, the private repairman who arrived would not repair it as the hoist was worn out and indicated that a repair job would cost $750.

After Wheat's futile attempts to repair the TM 70 had failed, and after numerous complaints to Leasing in May and June of 1973, Equipment sent Buck Worthley, who explained that Baptista was no longer with the company. Wheat explained to Worthley that their auto wrecking business was losing money because the TM 70 would not operate and reiterated that Wheat's requirement for a forklift was one that would perform in accord with their prior specifications of hoisting at least 7,000 pounds 11 feet into the air. Worthley then advised Wheat to buy a more expensive forklift, a CHY 140, and agreed to take back the TM 70 that Equipment sold to Wheat. By this time, Wheat had made a $1,000 downpayment and two monthly payments of $542.58 each, and, therefore, asked Worthley whether or not the TM 70 could be a trade-in on the new CHY 140. Worthley advised Wheat that the TM 70 was not worth what Wheat had paid for it, and that Equipment would not accept it as a trade-in, but would relieve Wheat from any further payments on the TM 70 if Wheat agreed to purchase the more expensive CHY 140. As Wheat had no more cash, they were forced to trade in their only other operating forklift, the TY 100, in order to purchase the CHY 140. On the $10,750 purchase price of the CHY 140, Wheat was credited with $3,850 for the trade-in of the TY 100.

Based on Worthley's above mentioned representations as to the TM 70, Wheat signed a second conditional sales contract with Leasing on July 19, 1973, for the purchase of the CHY 140. As part of this transaction, Wheat returned the defective used TM 70 to Equipment, which accepted it. Equipment's log sheet indicated that it received the TM 70 on June 19, 1973. Wheat would not have purchased the second and more expensive CHY 140 forklift if they had not been released from liability on the conditional sales contract on the TM 70. Wheat expected to receive credit on the CHY 140 for its equity on the used York, which was then over $2,000 ($1,000 downpayment and two payments of $542 each).

The conditional sales contract for the purchase of the CHY 140 was on an Equipment form. The form, however, mentioned Leasing on every page and indicated that the contract was to be assigned to Leasing. The invoice for the CHY 140 stated that the forklift is "sold to Clark Leasing Corporation in care of E & J Auto Wreckers." About this time, Wheat received and signed a document assigning the TM 70 and gave it to Worthley; subsequently, Leasing approved the assignment and forwarded the papers to AAA Auto Wrecking.

After Wheat had purchased the CHY 140 and returned the defective TM 70, Worthley called to indicate that he had sold the used TM 70 to AAA Auto Wreckers in Hayward owned by Merrill Brown. Worthley's deposition indicated that Brown had told him that he needed the York TM 70 for a job in northern California. Brown then commenced to make payments to Leasing, but stopped after the TM 70 forklift would not function.

After Brown stopped making payments on the York TM 70, Equipment was notified by Bill Hickey of Leasing's headquarters in Michigan that Wheat's conditional contract for the York TM 70 was in default. Leasing then talked with Wheat. Wheat received several telephone calls from Hickey who requested that Wheat make payments on the TM 70. Hickey explained that there was now a delinquency on the conditional sales contract signed by Wheat. At first, Wheat believed that Hickey was referring to the CHY 140 contract and assured Hickey that the payments were current and that Leasing's records were wrong. After several conversations, Wheat ascertained that, in fact, Hickey was referring to the contract for the TM 70. After Wheat explained the matter, Hickey indicated that he would straighten it out.

In addition to the telephone calls from Hickey, Wheat received numerous telephone calls from Coffee. On September 27, 1973, Coffee

had received a teletype from Hickey asking Coffee to follow up on Wheat's delinquency on the TM 70 payments. In response to one of Coffee's telephone calls, Wheat offered to assist Equipment and went to AAA Auto Wrecking. At Wheat's request, Brown of AAA wrote a check in the amount of one monthly payment on the TM 70, which Wheat mailed to Coffee. During all of these conversations, Leasing and Equipment were both aware that the TM 70 forklift was no longer at the Wheat yard but was in possession of AAA Auto Wreckers and Brown.

Subsequently, numerous conversations ensued and documents were sent between Coffee of Equipment and Hickey of Leasing concerning the TM 70 transaction. Both Hickey and Coffee contacted Wheat. In October 1973, Mr. Conant of Equipment talked with Risser of Leasing about the TM 70 transaction and sought advice as to the course of action for collecting the account. On October 25, 1973, Coffee recommended to Hickey that the matter be turned over to "Clark Legal" for immediate action. On November 1, 1973, Coffee sent a teletype to Hickey at Leasing headquarters in Michigan stating that the TM 70 "is now in the hands of AAA Auto Wrecking" and again suggested that the matter be turned over to "Clark Legal" for immediate action. A notation on the teletype indicated that "Hickey (Clark Leasing) will handle the matter." Coffee's records indicated that Worthley attempted to contact AAA for collection and was unsuccessful.

Equipment then realized that it had made a mistake. Worthley had taken the TM 70 back from Wheat and indicated that Wheat was to be released from the first agreement. Wheat had then signed over the TM 70 to Equipment and delivered it to the Equipment yard; Equipment, in turn, paid for the delivery of the TM 70 to AAA. However, Worthley then sold the forklift to AAA without making a proper credit check and also had delivered the TM 70 to Brown without obtaining the proper papers. Brown took the TM 70 and did not pay for it. After Equipment became aware of all of these facts and checked its paperwork, Equipment ascertained that it had apparently neglected to change its documents.

Equipment then undertook to pursue its rights against Wheat on the contract for the TM 70. Hickey of Leasing retained Attorney William E. Kesler, who did collections for Leasing. Kesler commenced the instant action for the return of personal property against both Wheat and Brown in the Alameda County Superior Court on April 2, 1974. While the complaint alleged the conditional sales contract for the TM 70 and Wheat's liability on this contract, it also admitted that Wheat did not have possession of the TM 70 which had been turned over to Brown of AAA.

The complaint also alleged that Brown had converted the TM 70 to his own use and had paid no consideration for it. Kesler also filed a declaration stating that Brown had possession of the TM 70. At trial, Kesler also testified that at the time of the filing of the complaint in April 1974, Equipment understood that possession of the TM 70 had been turned over to Brown. Uncontroverted evidence indicated that Equipment had contacted and then paid Mr. McClain to take the TM 70 from Equipment's yard to AAA.

At this time, Equipment had independent knowledge that Wheat no longer had possession of the used York TM 70 lift; Equipment also attempted to collect on and repossess the TM 70 from AAA. Leasing had received payments from AAA and Leasing had sent a memorandum to Wheat indicating that the matter had been straightened out. Kesler, acting for Leasing, proceeded to obtain two contempt orders against Wheat for failing to return the used TM 70. Uncontroverted evidence indicated that Wheat never claimed either possession or an ownership interest in the used York TM 70 after Wheat had returned it to Equipment.

Kesler was unable to locate the TM 70 to enforce his writ of possession. However, Kesler had been contacted several times by Mr. Creighton of AAA concerning payment on the TM 70; Kesler had also tried to collect from AAA rather than Wheat. Subsequently, Kesler obtained a contempt order against Wheat for hiding the TM 70. When this order, dated October 19, 1974, was served on Wheat, Wheat had not been served with the summons and complaint and did not know that on May 15, 1974, their default in the amount of $9,163.59[1] had been taken by Leasing. Although Kesler had talked to Wheat on several occasions and knew that Wheat did not have possession of the TM 70 which Equipment had sold to AAA, Kesler did not indicate to Wheat that an attorney should be contacted and also did not advise Wheat of the default.

Kesler called Wheat to request an extension of time on the order to show cause and also sought Wheat's assistance in serving the order on Brown. Kesler admitted that Wheat cooperated fully by granting the extension and by assisting with the service on Brown. This was Kesler's first contact with Wheat. Kesler acknowledged that Wheat never claimed that they were entitled to, or had possession of, the TM 70.

After the order to show cause was served on Brown, Creighton of AAA gave Kesler a check for $1,000 as payment on the TM 70. Kesler then

---

[1]This amount included $1,500 attorney fees and court costs of $232.30.

cancelled the order to show cause hearing set for November 8, 1974. However, after the $1,000 check from AAA bounced, Kesler filed a second contempt order against Wheat on December 3, 1974. Prior to the hearing on this second order to show cause set for December 18, 1974, Kesler was advised that the TM 70 had been returned to the Equipment yard and the contempt was discharged.

Kesler talked to Wheat on several occasions and was fully advised of their version of the facts. At one point, Kesler advised Wheat that he was not interested in obtaining any judgment against them but was only after Brown. At the time Kesler made these representations to Wheat in the fall of 1974, he had already taken a default against them on the contract for the TM 70 in May 1974, and sought to have them held in contempt of court for failing to return the TM 70 which Kesler knew Wheat did not possess. Leasing continued to retain Kesler as its counsel in the instant matter.

Subsequently, Wheat decided to retain counsel and then, for the first time, realized that their default had been taken. The court later set aside their default on the ground that Wheat had never been served with the original summons and complaint.

Thereafter, Wheat filed their answer and cross-complaint alleging that the misrepresentations made as to the TM 70 constituted fraud, misrepresentation, breach of implied warranty of fitness, and breach of implied warranty of merchantability. Wheat further alleged that Equipment's conduct in filing an action based on the first contract for the used York TM 70 after it had agreed to release them constituted fraud, negligent misrepresentation and breach of contract, and that the conduct of Equipment in issuing the writs of possession and contempt orders after Equipment knew that Wheat did not have or claim possession of the TM 70 constituted abuse of process. The evidence indicates that Equipment obtained the contempt orders for possession of specific property against Wheat, a party which Equipment knew was separate and distinct from AAA, the party that actually had possession of the TM 70.

After Wheat had purchased the CHY 140, they went to Allis-Chalmers Company to purchase a car crusher and gave Equipment as a credit reference since Wheat was current on the contract for the CHY 140 and believed that they had been released on the contract for the TM 70. Allis-Chalmers called Equipment and received derogatory credit information based on the fact that AAA had not paid on the TM 70 contract. Allis-Chalmers then turned Wheat down because of bad credit. Wheat

called Allis-Chalmers and had a conversation with the Allis-Chalmers credit department. Allis-Chalmers' credit department then called Equipment. Equipment indicated that although Wheat's version of the facts was true, Equipment still planned to pursue Wheat on the TM 70 contract, as it had no documents to pursue AAA.

On the day set for trial, Leasing dismissed its original complaint and Wheat again reiterated that it did not contest possession or ownership of the used York TM 70.

The matter proceeded to jury trial on Wheat's cross-complaint against Leasing and Equipment. The jury awarded William J. Wheat and Ernest R. Wheat each $4,500 and $5,000, respectively, in compensatory damages against Equipment, and $500 each in compensatory damages against Leasing; and $5,000 each in punitive damages against Leasing, for a total of $10,500 in compensatory damages, and a total of $10,000 in punitive damages.

## LEASING'S APPEAL

On its appeal, Leasing contends that the evidence was insufficient to sustain either the verdict against it for $1,000 compensatory damages or the award of punitive damages of $10,000.

■ Our power " '*begins* and *ends* with the determination as to whether there is any substantial evidence contradicted or uncontradicted which will support the finding of fact.' [Citation.] Defendant, on the other hand, in order to sustain its contention must 'demonstrate that there is *no* substantial evidence to support the challenged findings' " (*Stevens* v. *Parke, Davis & Co.,* 9 Cal.3d 51, 64 [107 Cal.Rptr. 45, 507 P.2d 653]). A reviewing court starts with the presumption that the record contains evidence to sustain every finding of fact (*Foreman & Clark Corp.* v. *Fallon,* 3 Cal.3d 875, 881 [92 Cal.Rptr. 162, 479 P.2d 362]). Substantial evidence may consist of the testimony of a single witness or even the testimony of a party (*In re Marriage of Mix,* 14 Cal.3d 604, 614 [122 Cal.Rptr. 79, 536 P.2d 479]; 6 Witkin, Cal. Procedure (2d ed. 1971) Appeal, § 248, p. 4240).

■ Leasing's contention concerning the insufficiency of the evidence for the fraud causes of action that were the basis of the punitive damages awarded is based on its futile attempt to separate itself from its parent, Equipment. Uncontroverted evidence established that Leasing was a wholly owned subsidiary of Equipment; Leasing's major function was to

oversee the financing of conditional sales contracts signed by purchasers who, like Wheat, bought items sold by Equipment. However, as is readily apparent from our above summary of the evidence, the TM 70 and CHY 140 transactions were totally integrated and inextricably intertwined with Equipment as the seller and Leasing as the financing arm of Equipment. Leasing's name appeared on both of the conditional sale contracts signed by Wheat; Wheat made all payments on both contracts to Leasing. Leasing does not dispute that it is a wholly owned subsidiary of Equipment, and that its function is to provide financing for sales of items by Equipment. The uncontroverted evidence indicated that in their transactions with Wheat, Leasing and Equipment operated jointly and used each other's agents.

■ The representations made by Baptista and Worthley constituted at least two bases for a finding of fraud. Baptista represented to Wheat that Leasing had a used York forklift that would meet Wheat's specifications of being able to hoist at least 7,000 pounds before Leasing ever saw or acquired the TM 70 that was sold to Wheat on March 1. After the TM 70 did not perform as specified, and could not be repaired, Worthley indicated to Wheat that while Equipment would not accept it as a trade-in, the TM 70 could be returned to Equipment and the contract voided if Wheat agreed to purchase the more expensive CHY 140. All of these representations were made to induce Wheat to buy the TM 70 and the CHY 140; both agreements were assigned to Leasing.

After Wheat signed the purchase order for the TM 70, Equipment wrote to, and obtained approval of, the transaction from Risser who worked for Leasing. After AAA stopped making payments on the TM 70, Equipment was notified of the fact by Hickey of Leasing's national headquarters in Michigan; Hickey also talked to Wheat. Hickey also asked Coffee, the credit manager for Equipment's Oakland branch, to follow up on Wheat's delinquency on the TM 70 agreement. In October 1973, Coffee recommended to Hickey that the matter be turned over to "Clark Legal" for immediate action. Hickey retained Kesler to file the claim and delivery action against Wheat and AAA. By stipulation, Wheat's cross-complaint against Baptista, Worthley, Hickey and Coffee, as individual defendants, was dismissed and the jury instructed that the above named were agents of Equipment. The record indicates that Baptista, Worthley and Coffee were all employees of Equipment, while Hickey was an employee of Leasing's national headquarters. Thus, the only reasonable conclusion from the instruction is that Hickey was an agent of Equipment because he was an employee of Equipment's subsidiary, Leasing. The jury was also instructed that it could award

punitive damages only as to the fraud causes of action, and then only if the acts of the agents were authorized, ratified or known, or within the course and scope of employment. Hickey approved the novation negotiated by Worthley when Hickey told Wheat that the matter of their delinquency on the TM 70 contract would be straightened out.

■ Contrary to Leasing's contentions, the fact that an agent or employee acts in excess of his authority or contrary to instructions is not inconsistent with an inference that he was acting within the scope of his employment (see *Tighe* v. *Ad Chong*, 44 Cal.App.2d 164 [112 P.2d 20] (liability not·restricted to cases where employee uses some instrumentality of employer); also 1 Witkin, Summary of Cal. Law (8th ed.) Agency and Employment, § 155, pp. 754-755), where the following exception appears: The modern theory of the doctrine was restated by our Supreme Court in *Hinman* v. *Westinghouse Elec. Co.*, 2 Cal.3d 956, 959-960 [88 Cal.Rptr. 188, 471 P.2d 988], quoting Prosser, Law of Torts (3d ed. 1964) page 471: "Although earlier authorities sought to justify the *respondeat superior* doctrine on such theories as 'control' by the master of the servant, the master's 'privilege' in being permitted to employ another, the third party's innocence in comparison to the master's selection of the servant, or the master's ·'deep pocket' to pay for the loss, *'the modern justification for vicarious liability is a rule of policy, a deliberate allocation of a risk. The losses caused by the torts of employees, which as a practical matter are sure to occur in the conduct of the employer's enterprise, are placed upon that enterprise itself, as a required cost of doing business.* They are placed upon the employer because, having engaged in an enterprise which will, *on the basis of past experience, involve harm to others through the torts of employees, and [thereby] sought to profit by it, it is just that he, rather than the innocent injured plaintiff, should bear them*; and because he is better able to absorb them, and to distribute them, through prices, rates or liability insurance, to the public, and so to shift them to society, to the community at large.' " (Italics added.)

■ The determination as to whether an employee committed a tort during the course of his employment turns on whether or not: 1) the act performed was either required or "incident to his duties" (*Curcic* v. *Nelson Display Co.*, 19 Cal.App.2d 46 [64 P.2d 1153]), or 2) the employee's misconduct could be reasonably foreseen by the employer in any event (*Ingle* v. *Bay Cities Transit Co.*, 72 Cal.App.2d 283 [164 P.2d 508]; see also 1 Witkin, Summary of Cal. Law (8th ed. 1973) Agency and Employment, § 164, p. 762). ■ The employer's liability under the doctrine of respondeat superior extends to malicious acts and other intentional torts of an employee committed within the scope of his

employment (*Ruppe* v. *City of Los Angeles,* 186 Cal. 400 [199 P. 496]; *Transcon. & W. Air* v. *Bank of America,* 46 Cal.App.2d 708, 713 [116 P.2d 791]; *Coats* v. *Construction & Gen. Laborers Local No. 185,* 15 Cal.App.3d 908, 913 [93 Cal.Rptr. 639]).

■ A principal or employer who is not at fault directly for the tortious conduct of his employee or agent in the commission of a fraud may become liable in any event (see generally, Rest. 2d Agency, § 256, et seq.). As Witkin notes, the cases do not always distinguish between the agency theories of actual or ostensible authority and the tort doctrine of respondeat superior (1 Witkin, Summary of Cal. Law, *supra,* § 177, p. 775). Witkin further states:

"*Liability may also be based on imputed knowledge. Thus, where the principal actually or apparently authorizes representations about a matter related to the agent's duties, and the agent has knowledge of their falsity, this knowledge may be imputed to the principal, even though the agent is acting adversely.* (See Rest.2d, Agency §256, Comment d, §272 et seq.; supra, §146; 3 Am.Jur.2d, Agency §282; cf. *Pashley* v. *Pac. Elec. Ry. Co.* (1944) 25 C.2d 226, 236, 153 P.2d 325 [notice imputed to prevent running of statute of limitations].)" (§ 177, p. 775; italics partially added.)

"*If the principal places the agent in a position to defraud, and the third person relies upon his apparent authority to make the representations, the principal is liable even though the agent is acting for his own purposes.* (Rest.2d, Agency §§261, 262, and Appendix, Rep. Notes, pp. 420, 429.) *The theory is that the agent's position facilitates the consummation of the fraud, in that from the point of view of the third person the transaction seems regular on its face and the agent appears to be acting in the ordinary course of the business confided to him. It is immaterial that the principal receives no benefits from the transaction.*" (§ 178, p. 776; italics partially added.)

We also find particularly apt here *Rutherford* v. *Rideout Bank,* 11 Cal.2d 479 [80 P.2d 978, 117 A.L.R. 383]. In *Rutherford,* T., branch manager of defendant bank and a frequent business adviser of plaintiff, falsely represented that the bank would foreclose its mortgage unless she sold her land to a certain person. In reliance she sold for less than its reasonable value. In holding the bank liable for fraud, our Supreme Court emphasized two factors: 1) T. was acting within the scope of his apparent authority in discussing with debtors of the bank its contemplated action in connection with its security, and in advising them generally as to their business affairs; 2) *T.'s position gave him potential power to accomplish a wrongful act under color of his office.*

■ Similarly here, ample substantial evidence indicated that the acts of Baptista, Worthley, Coffee and Hickey were all done in the course and scope of their employment, were incidental to their respective duties and could reasonably be foreseen by Leasing and Equipment.

The theoretical basis and scope of the doctrine of respondeat superior were elaborately reviewed in *Rodgers* v. *Kemper Constr. Co.,* 50 Cal.App.3d 608 [124 Cal.Rptr. 143], which involved a tortious assault,[2] as follows: "The doctrine, which departs from the normal tort principle that liability follows fault, is an ancient one but its scope and stated rationale have varied widely from period to period. (See 2 Harper & James, The Law of Torts, pp. 1361-1374; Prosser, Torts (4th ed. 1971) pp. 458-459.) It has been aptly stated that 'Respondeat superior has long been a rule in search of a guiding rationale.' (Note, 82 Harv.L.Rev. 1568, 1569.) . . .

■ *"In some respects this rationale is akin to that underlying the modern doctrine of strict tort liability for defective products. [Citations.] . . . It is grounded upon 'a deeply rooted sentiment that a business enterprise cannot justly disclaim responsibility for accidents which may fairly be said to be characteristic of its activities.'* [Citations.]

■ *"One way to determine whether a risk is inherent in, or created by, an enterprise is to ask whether the actual occurrence was a generally foreseeable consequence of the activity. However, 'foreseeability' in this context must be distinguished from 'foreseeability' as a test for negligence.* In the latter sense 'foreseeable' means a level of probability which would lead a prudent person to take effective precautions *whereas 'foreseeability' as a test for respondeat superior merely means that in the context of the particular enterprise an employee's conduct is not so unusual or startling that it would seem unfair to include the loss resulting from it among other costs of the employer's business.* [Citations.] *In other words, where the question is one of vicarious liability, the inquiry should be whether the risk was one 'that may fairly be regarded as typical of or broadly incidental' to the enterprise undertaken by the employer.* [Citation.]

■ *". . . the test for determining whether an employer is vicariously liable for the tortious conduct of his employee is closely related to the test applied in workers' compensation cases for determining whether an injury*

[2]We need not distinguish between a tortious assault and the intentional fraud revealed by the instant record. The fraud and misrepresentations made by Baptista, Worthley and Hickey were in a sense an assault on Wheat's pocketbook, credit and business reputation and peace of mind. The intangible nature of the interests affected does not lessen the serious harm caused.

*arose out of or in the course of employment.* [Citation.] *This must necessarily be so because the theoretical basis for placing the loss on the employer in both the tort and workers' compensation fields is the allocation of the economic cost of an injury resulting from a risk incident to the enterprise.* [Citations.] Consequently, our high court has on many occasions relied upon workers' compensation cases in tort cases." (Pp. 618-619; italics added.)

■ We find the above analysis helpful and applicable in the instant case as Baptista's, Worthley's and Hickey's misrepresentations to Wheat were not unusual or startling in the context of the enterprise. Selling a consumer a second and higher priced product, after first selling or offering a lower priced one which does not work, is unfortunately such a common practice that the generic term "lo-balling" has emerged to designate the particular practice.

■ As to Kesler, he was clearly within the scope of his apparent authority as the attorney employed by Leasing to collect on the TM 70 contract. Further, his position gave him the potential power to accomplish a wrongful act under the color of his office. When he obtained the contempt orders against Wheat for hiding the TM 70, Kesler knew that the TM 70 had been sold to AAA and that Wheat never asserted any interest in the TM 70.

Uncontroverted evidence established that Kesler was employed by Leasing to collect on the TM 70 contract. Kesler's appearance as an attorney on behalf of Leasing created a *presumption* that Kesler had authority to do all acts necessary or incidental to the conduct of the case, including the obtaining of the order to show cause against Wheat. As stated in *Dale* v. *City Court of Merced,* 105 Cal.App.2d 602, 608 [234 P.2d 110]: " 'The rule, founded in reason and sanctioned by the authorities, is that it is presumed that an attorney appearing and acting for a party to a cause has authority to do so, and to do all other acts necessary or incidental to the proper conduct of the case, and the burden of proof rests on the party denying such authority, to sustain his denial by a clear preponderance of the evidence.' " This presumption creates an inference that Leasing authorized the doing and the manner of the act by Kesler in obtaining the contempt orders. The record indicates that the jury was properly instructed.

Further, as stated in *Dale* v. *City Court of Merced, supra,* the *burden of proof* was on Leasing to show that Kesler was not authorized to use the

court's process against Wheat. Leasing never suggested that Kesler was not authorized to obtain the contempt orders and adduced no evidence that tended to refute Kesler's authority. Thus, the jury was justified in inferring that Kesler acted within the scope of his authority.

There is also substantial evidence to sustain the jury's award of punitive damages on the basis of Leasing's continued retention of Kesler after receiving knowledge of his conduct in obtaining the contempt orders. Leasing's retention of Kesler and failure to challenge Kesler's authority to act in its behalf constituted a ratification of Kesler's conduct. Thus, Leasing could be found liable for punitive damages for the wrongful acts of Kesler (*Bertero* v. *National General Corp.,* 13 Cal.3d 43, at p. 67 [118 Cal.Rptr. 184, 529 P.2d 608, 65 A.L.R.3d 878]). Contrary to Leasing's contention, " '. . . Failure to discharge an employee or agent guilty of oppressive acts towards patrons of the employer *is in itself evidence* to show ratification. . .' " (*Coats* v. *Construction and Gen. Laborers Local No. 185, supra,* 15 Cal.App.3d, p. 914; italics added). We conclude that there was ample substantial evidence to support the verdict and judgment against Leasing and its agents on Wheat's cause of action for fraud.

As to the compensatory damages awarded, this court (Division One) recently reiterated the rule that the compensable damages allowable for fraud include mental suffering (*James* v. *Public Finance Corp.,* 47 Cal.App.3d 995, 1000 [121 Cal.Rptr. 670]). Thus, there was sufficient substantial evidence to support the verdict of $10,000 punitive damages for fraud against Leasing.

As to the abuse of process, the uncontroverted evidence established that Leasing employed Kesler to file the instant action in which the contempt orders were issued.

The essential elements of a cause of action for abuse of process are: 1) an ulterior purpose and 2) a willful act in " '. . . the use of the process not proper in the regular conduct of the proceeding. Some definite act or threat not authorized by the process, or aimed at an objective not legitimate in the use of the process, is required; and there is no liability where the defendant has done nothing more than carry out the process to its authorized conclusion, even though with bad intentions. The improper purpose *usually takes the form of coercion to obtain a collateral advantage, not properly involved in the proceeding itself,* such as the *surrender of property or the payment of money, by the use of the process*

*as a threat or a club.* There is, in other words, a form of extortion, and it is what is done in the course of negotiation, rather than the issuance or any formal use of the process itself, which constitutes the tort.' (Emphasis added; Prosser on Torts, (2d ed.) p. 667.)" (*Spellens* v. *Spellens,* 49 Cal.2d 210, at pp. 232, 233 [317 P.2d 613].)[3]

Leasing's contention that all that Wheat has managed to prove is the tort of malicious prosecution is entirely without merit. ▆▆▆ We note that abuse of process is much broader than malicious prosecution. The breadth of abuse of process is based on its history. The tort evolved as a "catch-all" category to cover improper uses of the judicial machinery that did not fit within the earlier established *but narrowly circumscribed,* action for malicious prosecution (*Twyford* v. *Twyford,* 63 Cal.App.3d 916, 923 [134 Cal.Rptr. 145]; *Barquis* v. *Merchants Collection Assn.,* 7 Cal.3d 94, 104, fn. 4 [101 Cal.Rptr. 745, 496 P.2d 817]).

▆▆▆ In order to establish a cause of action for malicious prosecution, the plaintiff must allege that the action which was wrongfully instituted or instigated lacked probable cause (*Randleman* v. *Boeres,* 93 Cal.App. 745, 752 [270 P. 374]), was improperly motivated by malice and/or ill will (*Gogue* v. *MacDonald,* 35 Cal.2d 482 [218 P.2d 542, 21 A.L.R.2d 639]), and that there was a favorable termination of the proceeding (*Jaffe* v. *Stone,* 18 Cal.2d 146, 150 [114 P.2d 335, 135 A.L.R. 775]).

▆▆▆ " ' "The gist of the action for abuse of process lies in the improper use of process after it is issued. *To show that regularly issued process was perverted to the accomplishment of an improper purpose is*

---

[3]In *Spellens,* at page 229, as in the instant case, the cause of action for abuse of process was alleged in a cross-complaint in the action in which the process issued. In *Spellens,* our Supreme Court, at page 231, quoted from *Tranchina* v. *Arcinas,* 78 Cal.App.2d 522, 525 [178 P.2d 65], the following, which is itself a quotation from 3 Restatement of Torts, section 682, page 464: " ' "One who uses legal process, whether criminal or civil, against another to accomplish a purpose for which it is not designed is liable to the other for the pecuniary loss caused thereby.

" ' "*Comment*:

" ' "a. The gravamen of the misconduct for which the liability stated in this Section is imposed is not the wrongful procurement of legal process or the wrongful initiation of criminal or civil proceedings; *it is the misuse of process, no matter how properly obtained, for any purpose other than that which it was designed to accomplish. Therefore, it is immaterial that the process was properly issued, that it was obtained in the course of proceedings which were brought with probable cause and for a proper purpose or even that the proceedings terminated in favor of the person instituting or initiating them.* The subsequent misuse of the process, though properly obtained, constitutes the misconduct for which the liability is imposed under the rule stated in this Section." ' " (Italics partially added.)

*enough.*" ' " (*Spellens* v. *Spellens, supra,* 49 Cal.2d, at p. 231, quoting from *Dean* v. *Kochendorfer,* 237 N.Y. 384 [143 N.E. 229, 231].)

Dean Prosser, in Law of Torts (4th ed. 1971), also quoted in *Spellens, supra,* defines the tort as follows: "Abuse of process differs from malicious prosecution in that the gist of the tort is not commencing an action or causing process to issue without justification, but misusing or misapplying process justified in itself for an end other than that which it was designed to accomplish. The purpose for which the process is used, once it is issued, is the only thing of importance. Consequently in an action for abuse of process it is unnecessary for the plaintiff to prove that the proceeding has terminated in his favor, or that the process was obtained without probable cause or in the course of a proceeding begun without probable cause" (ch. 22, § 121, p. 856). To the same effect is *Tellefsen* v. *Key System Transit Lines,* 198 Cal.App.2d 611, 613-614 [17 Cal.Rptr. 919].

Thus, there may be an abuse of process in an action in which the person obtaining issuance of the process has prevailed and in which the judgment in his favor is final (*Tranchina* v. *Arcinas, supra,* 78 Cal.App.2d 522; *Christensen* v. *Younger,* 47 Cal.App.3d 613, 619 [120 Cal.Rptr. 923]).

Leasing erroneously urges that Wheat's cause of action for abuse of process was predicated upon Leasing's filing of the original complaint against Wheat instead of the two contempt orders. Wheat adduced evidence, which the jury apparently believed, that Leasing obtained two orders against Wheat to show cause why they should not be held in contempt of court for failing to turn over possession of the TM 70, which Leasing knew that Wheat no longer possessed. Thus, Leasing's acts constituted an actionable abuse of process. The record indicates that the jury was properly instructed that it could only find abuse of process in connection with the orders to show cause, not the filing of the complaint.

Contrary to Leasing's contentions, the two orders to show cause re contempt were properly considered as "process" within the definition of the tort. The term "process" has been broadly interpreted to include the entire range of procedures incident to litigation. An order to show cause re contempt is *not* a discovery device, but rather, ". . . a special proceeding, criminal in character, governed by the provisions of the Code of Civil Procedure . . . intended to implement the inherent power of the court to conduct the business of the court. . ." (*Pacific Tel. & Tel. Co.* v. *Superior Court,* 265 Cal.App.2d 370, 371-372 [72 Cal.Rptr. 177]).

Substantial evidence demonstrates that Leasing attempted to use the contempt orders to obtain a collateral advantage. Kesler testified that once he had obtained the writ of possession in May 1974 for the TM 70, he was contacted by Creighton of AAA about payment thereon. After the subsequent discussions regarding AAA's payment on the vehicle were not satisfactory, Kesler obtained the contempt order against Wheat. Leasing's improper purpose was sufficiently demonstrated by the Allis-Chalmers memo of its conversation with Equipment. The memo indicates that Equipment admitted to Allis-Chalmers that Wheat's version of the facts was true and that Equipment was going to pursue Wheat because it had no documents to pursue AAA.

As to Leasing's contention that it had no independent knowledge that the TM 70 had been sold to AAA, the record summarized below clearly indicates that Leasing knew that Wheat no longer had possession of the TM 70.[4] As indicated above, a principal is chargeable with, and bound by, the knowledge of, or notice to, his agent (*Trane Co.* v. *Gilbert*, 267 Cal.App.2d 720, 727 [73 Cal.Rptr. 279]). Thus, where as here, an agent is put on notice by knowledge of facts sufficient to put a reasonable man on inquiry, the notice will be imputed to the agent's principal and is binding on the principal. The rule of imputed knowledge applies to an attorney acting for a corporate client (*N. Y. Life Ins. Co.* v. *Occidental Pet. Corp.*, 43 Cal.App.2d 747, 751 [111 P.2d 707]).

[4]For example, the following amply demonstrates Leasing's knowledge or imputed knowledge of the fact that Wheat no longer had possession of the TM 70: 1) Equipment's agent, Worthley, represented to Wheat that they would be released from liability on the TM 70 when they purchased the second CHY 140 lift; 2) the TM 70 was returned to Equipment's yard on June 19, 1973, and Equipment took it into their inventory; 3) Equipment sold the lift to AAA; 4) Worthley "had attempted to contact AAA for collection" sometime prior to October 25, 1973; 5) Equipment's agent, Coffee, was informed that the vehicle was at AAA and sent a teletype to Hickey at Leasing's headquarters acknowledging that the TM 70 "is now in the hands of AAA Auto Wrecking," and suggesting that the matter be turned over to "Clark Legal" for action; 6) Conant, Equipment's controller in Oakland, informed Risser, head of Leasing's credit department, about the transaction and AAA's possession of the TM 70; 7) Hickey, of Leasing's national headquarters made several telephone calls to Wheat regarding payments, and after Wheat explained the situation to him, Hickey stated he would straighten the matter out; 8) Equipment had accepted payments on the forklift from AAA and AAA had contacted Leasing's attorney Kesler regarding payment in May 1974; 9) Leasing informed its attorney that the TM 70 had been transferred to AAA; 10) Kesler executed a declaration under penalty of perjury in support of Equipment's complaint for possession, stating that "defendant Merrill J. Brown has in his possession personal property belonging to plaintiff [the TM 70 forklift]"; 11) Equipment communicated with Allis-Chalmers, confirming the Wheat version of the facts concerning possession of the TM 70.

 Leasing's reliance on *Kyne* v. *Eustice,* 215 Cal.App.2d 627, 633 [30 Cal.Rptr. 391], is inapposite. *Kyne* held that a defendant is not required to rely on the word of a plaintiff, but is entitled to verify her statement and to *inquire.* However, the record indicates that neither Leasing nor Equipment attempted to verify Wheat's statements or conduct any inquiry as to the location or possession of the TM 70. Despite the numerous indications that the TM 70 was actually in possession of AAA and being used on a job in northern California, neither Leasing nor Kesler undertook any investigation to verify its actual possession of the TM 70 but rather attempted to coerce Wheat to do the investigation.

We conclude that there was ample substantial evidence to support the verdict and judgment against Leasing on Wheat's cause of action for abuse of process (*Barquis* v. *Merchant's Collection Assn., supra,* 7 Cal.3d 94; *Stevens* v. *Parke, Davis & Co., supra,* 9 Cal.3d, p. 64).

The award of general and exemplary damages for abuse of process is well supported. Contrary to Leasing's contentions, *Templeton Feed & Grain* v. *Ralston Purina Co.,* 69 Cal.2d 461 [72 Cal.Rptr. 344, 446 P.2d 152], is in point. Also see *Czap* v. *Credit Bureau of Santa Clara Valley,* 7 Cal.App.3d 1 [86 Cal.Rptr. 417], wherein this court (Division Four) held at page 5 that a plaintiff whose wages had been garnished by a defendant who knew that they were exempt was entitled to compensatory and exemplary damages as well as injunctive relief for abuse of process. We also note that more recently in *Weisenburg* v. *Molina,* 58 Cal.App.3d 478 [129 Cal.Rptr. 813], the appellate court affirmed the trial court judgment on a jury verdict awarding plaintiff $625.40 compensatory and $25,000—$3,240.18 punitive damages against two of three defendants for an obvious and flagrant abuse of process. In *Weisenburg,* the defendants hindered the plaintiff in his collection of a judgment against one of them by filing a false and fraudulent complaint, whereby another defendant obtained a judgment against the judgment debtor defendant, in order to defeat the plaintiff's attempts to satisfy the judgment.

EQUIPMENT'S APPEAL

Equipment argues that the adverse judgment against it was based on the breach of contract that was not enforceable as it violated the statute of frauds (Civ. Code, § 1624) and further was based on inconsistent theories.

Equipment's attempt to raise the statute of frauds defense for the first time on appeal need not be discussed in detail. The record indicates that

the statute of frauds defense was not pled or in any manner raised below (*Howard* v. *Adams,* 16 Cal.2d 253, 257 [105 P.2d 971, 130 A.L.R. 1003]; *Nunez* v. *Morgan,* 77 Cal. 427 [19 P. 753]; *Romano* v. *Wilbur Ellis & Co.,* 82 Cal.App.2d 670, 674 [186 P.2d 1012]; *Schultz* v. *Noble,* 77 Cal. 79 [19 P. 182]; *Livermore* v. *Stine,* 43 Cal. 274; *Christie* v. *Commercial Casualty Ins. Co.,* 6 Cal.App.2d 710, 720 [45 P.2d 263]; *Durbin* v. *Hillman,* 50 Cal.App. 377 [195 P. 274]). Equipment's reliance on *Kerner* v. *Hughes Tool Co.,* 56 Cal.App.3d 924 [128 Cal.Rptr. 839], is inapposite. The instant case does not fall within any of the exceptions[5] to the rule that an appellate court will not consider procedural defects.

 Equipment's argument that the award of damages[6] against it was based on an inconsistent recovery for breach of two mutually exclusive contracts is equally inapposite. Equipment's contention ignores the principle that on appeal all intendments and reasonable inferences will be indulged in to sustain the findings (*Stevens* v. *Parke, Davis & Co., supra,* 9 Cal.3d 51). As was stated by our Supreme Court in *Bertero* v. *National General Corp., supra,* 13 Cal.3d 61: "A reviewing court must uphold an award of damages whenever possible [citations] and all presumptions are in favor of the judgment."

 The record indicates that several legal theories were submitted to the jury to support the verdict against Equipment: breach of express warranty, breach of implied warranty of merchantability, breach of implied warranty of fitness for a particular purpose, fraud, negligent misrepresentation, and breach of contract. The evidence and the verdict indicate that at least part of the damages awarded against Equipment were based on the misrepresentations made by Baptista in the sale of the TM 70, detailed in our initial statement of the facts above. As the jury's verdict can be sustained on the basis of fraud, as discussed above, Equipment's reliance on *Davisson* v. *Faucher,* 105 Cal.App.2d 445 [233 P.2d 567], is misplaced. In *Davisson,* by the second written agreement, the

[5]Such as: 1) a noncurable defect of substance, i.e., lack of jurisdiction (*Sharove* v. *Middleman,* 146 Cal.App.2d 199, 202 [303 P.2d 900]); 2) failure to find on a material issue—affirmative defense of lack of personal jurisdiction (*Tyre* v. *Aetna Life Ins. Co.,* 54 Cal.2d 399 [6 Cal.Rptr. 13, 353 P.2d 725]; 3) a matter involving public interest of the due administration of justice, e.g., illegality or unclean hands (*People* v. *Kitchens,* 46 Cal.2d 260 [294 P.2d 17]; *Hager* v. *Hager,* 174 Cal.App.2d 546, 550 [345 P.2d 68]); 4) a rule based on public policy, e.g., the rule against perpetuities (*United California Bank* v. *Bottler,* 16 Cal.App.3d 610, 616 [94 Cal.Rptr. 227]).

[6]The record indicates that Wheat established compensatory damages totaling over $13,000: $1,000 downpayment and two monthly payments totaling $1,085 on the TM 70; $600 for parts to repair the TM 70; $3,500 in lost profits as the TM 70 did not operate properly; $3,000 loss on the trade-in of the TY 100; and attorney fees of $4,311.

buyer expressly absolved the seller from liability for the prior false representations that had accompanied the first oral contract. The jury's award of damages against Equipment for misrepresentations made in the sale of the TM 70 to Wheat is not inconsistent with any other portion of the judgment.

More pertinent here is *Lawson* v. *Town & Country Shops, Inc.,* 159 Cal.App.2d 196 [323 P.2d 843]. In *Lawson,* the appellant, as in the present case, contended that the plaintiffs could not recover for misrepresentations where plaintiffs had remained in contractual relations with defendants after discovery of the fraud and had requested and received certain modifications of their contractual obligations. The appellate court dismissed the contention as follows at page 201: "A careful review of some of the more recent cases, however, indicates that there can be no waiver in the absence of an intentional relinquishment of a known right, and that requests for modifications of contractual provisions and even the acceptance thereof merely are factors to be considered in determining whether the requisite intent was express, or whether it can be implied or inferred from the surrounding circumstances." The instant record reveals no indication of any express or implied relinquishment of Wheat's right to damages for Equipment's misrepresentations when Wheat entered into the subsequent agreement for the CHY 140. Thus, the jury's award of damages based on Equipment's misrepresentations about the TM 70 was completely proper.

The judgments are affirmed.

Rouse, J., and Miller, J., concurred.

A petition for a rehearing was denied May 31, 1979, and the opinion was modified to read as printed above.